**Cheryl NYE, Plaintiff,**

v.

**Carl ROBERTS, et al., Defendants.**

**No. CIV JFM 99-1797.**

United States District Court,
D. Maryland.

April 4, 2001.

---

208

Nancy Black, Baltimore, MD, Albert Russell Snyder, Snyder and Bailey, LC, Salisbury, MD, for Plaintiff.

Leslie R. Stellman, Blum, Yumkas, Mailman, Gutman & Denick, P.A., Baltimore, MD, for Defendants.

*MEMORANDUM*

MOTZ, District Judge.

Now pending before the court are the Motion of Defendants Carl Roberts and the Board of Education of Cecil County to Dismiss and/or, Alternatively, for Summary Judgment; Defendant Carl Roberts' Motion to Dismiss or, in the Alternative, for Summary Judgment; the Plaintiff's Motion for Partial Summary Adjudication; the Defendants' Motion to Strike Plaintiff's Responses to Defendants' Allegations of Material Undisputed Facts; the Defendants' Motion to Enlarge Page Limitation for Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment; and the Defendants' Motion for Leave to File A Response to Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Partial Summary Adjudication. The facts relevant to the motions are discussed below.

Cheryl Nye ("Nye") was hired as a school psychologist by the Cecil County Public Schools ("CCPS") in 1981. Beginning in 1989, she was assigned to Leeds Elementary School ("Leeds"). She alleges that Leeds' principal, Robert Harris ("Harris"), harassed her numerous times during the 1993–94 school year, and the spring and summer of 1996. First, Harris and Nye were discussing a student in a school hallway when Harris, who was leaning against the wall, put his arm around Nye, "came in close proximity of [her] face," and said, "Isn't this nice, just like in high school." Second, Harris approached Nye in the hallway, with the intent of harassing her, when Nye told him, "There is a kid behind me," thus preventing an incident. Third, in May 1994, Nye was using the phone in Harris' office, when he entered the office, put his hands on her shoulders and leaned in to kiss her neck. She was forced to push him away. Fourth, Harris attempted to grab Nye after a special education meeting (known as "ARDS"). Nye believed Harris was trying to grab her breast; she pushed his arm away. Nye alleges that Harris tried to grab her at other ARDS meetings, as well. At the end of the school year, she requested a transfer away from Leeds. Nye did not reveal that Harris' harassment prompted the request. The transfer was granted.

In the spring of 1996, Nye ran into Harris at a hallway in the Board of Education's central office. Harris asked her about her marriage and said he wanted her to come back to Leeds. He then put his arm around her waist and whispered, "You can be my girlfriend again." Nye then learned that she had been transferred back to Leeds. During a break in an August 15, 1996 Administrators & Supervisors meeting, Harris grabbed Nye's arm, learned in and said, "You're back in my school." Nye has also alleged that Harris harassed other teachers and that Nye witnessed other harassment by CCPS administrators and supervisors.

Nye complained about Harris' harassment on August 19, 1996 to Dr. R. Wayne Carmean ("Carmean"), the Assistant Superintendent for Instruction, and Henry Shaffer ("Shaffer"), the Director of Human Resources. The Superintendent of Schools, Dr. Carl Roberts ("Roberts"), authorized an investigation, led by Carmean and Ms. Helen Chapman ("Chapman"), Supervisor in Human Resources. In a report dated September 20, 1996, they stated that although they interviewed numerous witnesses, they could neither corroborate nor refute Nye's allegations. On January 15, 1997, Nye's attorney, Andrew Fury, wrote a letter to Carmean, notifying him of additional evidence corroborating Harris' harassment. Carmean and Chapman investigated these incidents by interviewing witnesses and again concluded that they

could neither corroborate nor refute Nye's allegations. Harris was not reprimanded, although Chapman and Carmean recommended sexual harassment retraining.

On May 20, 1997, Nye wrote to the Office for Civil Rights in the Department of Education ("OCR"), stating in an unsworn letter that she had been the victim of sexual harassment. On October 15, 1997, the Equal Employment Opportunity Commission ("EEOC") received Nye's sworn charge, which is dated October 3, 1997. Nye resigned by letter dated August 28, 1998.

Nye filed suit on June 18, 1999. She claims that CCPS perpetuated a hostile work environment, that she was retaliated against for complaining about sexual harassment and that she was constructively discharged in violation of 42 U.S.C. § 2000e *et seq.* ("Title VII").[1]

## I.

I find it necessary to discuss at length only the Motion of Defendants Carl Roberts and the Board of Education of Cecil County to Dismiss and/or, Alternatively, for Summary Judgment.[2] Defendants first claim that they are entitled to summary judgment (or dismissal) of Nye's claim for a hostile work environment.

■ Before filing suit under Title VII, a plaintiff must timely file an administrative charge with the EEOC. *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 239 (4th Cir. 1999). The basic rule is that a plaintiff must file within 180 days of the alleged discrimination. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir. 1998). In a "deferral state" (a state that has its own law prohibiting discrimination and an agency enforcing the law), a plaintiff who first files with the state agency has 300 days to file with the EEOC. *Id.* Because Maryland is a deferral jurisdiction (and, as I held in a Memorandum entered May 19, 2000, Nye effectively filed with Maryland by writing to the OCR), the relevant time period is 300 days. Nye wrote a letter to the OCR on May 20, 1997 and filed a charge with the EEOC on October 15, 1997. The defendants argue that the OCR letter did not constitute a charge "under oath or affirmation" under Title VII because it was not verified until October 15, 1997. At that point, however, the charge was untimely. Alternatively they argue that even if the verified charge

---

1. Given the serial nature of Nye's retaliation claims, I discuss the facts giving rise to Nye's claims in that section of the Memorandum.

2. I deny the Defendants' Motion to Strike Plaintiff's Responses to Defendants' Allegations of Material Undisputed Facts and grant the Defendants' Motion to Enlarge Page Limitation for Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment. I deny the Plaintiff's Motion for Partial Summary Adjudication. A party may not bring a motion under Fed.R.Civ.P. 56(d) for relief on part of a claim. *See, e.g., City of Wichita v. United States Gypsum Co.*, 828 F.Supp. 851, 869 (D.Kan.1993) (noting that Rule 56(d) "does not authorize an independent motion to establish certain facts as true but merely serves to salvage some constructive result from the judicial effort expended in denying a proper summary judgment motion"); *Arado v. Gen. Fire Extinguisher Corp.*, 626 F.Supp. 506, 509 (N.D.Ill.1985) ("There is no such thing as an independent motion under Rule 56(d)."). Even if part of Nye's motion can be construed as a motion for partial summary judgment on her retaliation claim, I am denying that portion of the motion because I find that the defendants are entitled to summary judgment. *See* Part II, *infra.* I will also grant Defendant Carl Roberts' Motion to Dismiss or, in the Alternative, for Summary Judgment. *Cf. Alvarado v. Board of Trustees*, 848 F.2d 457, 461 (4th Cir.1988) (not finding reversible error where district court dismissed suit against college president not named in administrative charge because university had been sued and president was sued only in official capacity).

relates back to the OCR letter, the OCR letter is timely only with regard to two of the incidents (in the spring of 1996 and August 1996, respectively) giving rise to the present suit. Accordingly, unless these two acts are part of a continuing violation with those occurring in 1994, the prior incidents must be barred.

I decide only the first argument. The Fourth Circuit has recently held that a sworn charge filed outside the limitation period does not relate back to an unsworn one filed within it. *Edelman v. Lynchburg Coll.*, 228 F.3d 503, 509 (4th Cir.2000) (noting that the EEOC's reading of Title VII as authorizing relation back conflicts with the text of the statute). Nye's OCR letter was not under oath. Therefore, under *Edelman*, her charge was not effectively filed until October 15, 1997.[3] That date is more than 300 days from the last incident giving rise to the sexual harassment claim—the August 15, 1996 incident. Although the defendants did not raise this argument in May, they would have had little reason to do so; *Edelman* is self-admittedly at odds with the law of other circuits. *Id.* at 510–11. Accordingly, I find no reason not to apply *Edelman* and dismiss Nye's claim for a hostile work environment.[4]

## II.

In count II of her amended complaint, Nye claims that she was retaliated against in violation of Title VII.

Nye claims that CCPS took "over 25 retaliatory actions" in the sixteen months following her internal complaint. (Pl.'s Opp'n at 29.) My reading of her opposition memorandum reveals eight specific actions. First, she claims that CCPS reprimanded her on April 15, 1998 for notifying the EEOC of alleged harassment of another employee, Leslie Rink, and for a confrontation between Nye and another school psychologist, Melissa Weyl. (Pl.'s Opp'n at 30.) Second, she claims that she was not promoted to a position for which she had been recommended. (Pl.'s Opp'n at 27.) Third, she claims that Carmean gave her a bad evaluation in June of 1998. (Pl.'s Opp'n at 28.) Fourth, she claims that she was criticized about a psychology presentation she made in March of 1998. (Pl.'s Opp'n at 29.) Fifth, she claims that she was removed from committees and other assignments. *Id.* Sixth, she claims that she was required to account for her whereabouts and unfairly criticized when she was not where she was supposed to be.

---

3. Nye argues that the statute of limitations should be equitably tolled. Although *Edelman* explicitly allows for tolling, 228 F.3d at 511, the circumstances in this case do not warrant it. The record indicates that at least as early as September 1996, and as late as January 1997, Nye was represented by counsel. (Letter from Carmean and Chapman to Roberts of 9/20/96; Letter from Fury to Carmean of 1/15/97.) *Cf. Edelman*, 228 F.3d at 511 (refusing to toll the period because plaintiff was represented by counsel throughout the administrative process). Alternatively, Nye attempts to distinguish *Edelman* in two ways. First, she claims that the EEOC did not mail the charge to her for signature until *after* the 300–day period elapsed. The time frame of the EEOC's response, however, followed from Nye's own delay in beginning the

charge process with the OCR. Second, she claims that the OCR notified CCPS of the charges contained in the letter. Although Nye references a letter from the OCR as "Exhibit 28," Pl.'s Opp'n at 20, the letter is not included in her submission to the court. Moreover, given *Edelman's* strict reading of Title VII, it appears unlikely that notice to the employer alone would waive the requirements for administrative exhaustion.

4. Having permitted discovery to proceed, I realize that it seems unfair to both parties to dismiss the case under *Edelman*. Nonetheless, I am still bound by *Edelman*. I do not express any views on the merits of Nye's hostile work environment claim.

(Pl.'s Opp'n at 30.) Seventh, she claims that she was questioned regarding her role three years earlier in releasing a student from special education services. *Id.* Eighth, she claims that she was denied the opportunity to apply for a psychologist coordinator position when Carmean limited the position to twelve-month personnel.

■ A plaintiff may prove a claim of retaliation under Title VII through direct evidence or circumstantial evidence. If she relies on circumstantial evidence, the familiar *McDonnell Douglas* framework applies. A plaintiff must first prove a prima facie case of discrimination, giving rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 607 (4th Cir. 1999). The defendant then must produce a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817; *Brinkley,* 180 F.3d at 607. If the defendant discharges this burden of production, the plaintiff must show that the defendant's proffered reason is a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817; *Brinkley,* 180 F.3d at 607. The ultimate burden of proof remains with the plaintiff, who must show that the employer intentionally discriminated against the plaintiff. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2106–07, 147 L.Ed.2d 105 (2000); *Brinkley,* 180 F.3d at 607.

■ Of Nye's eight reprimand theories, only the first (the April 15, 1998 reprimand letter) and third (the June 1998 evaluation) warrant extended discussion.[5] The April

5. The other six theories fail. Her second theory, based on a failed promotion, lacks causation because Nye has offered no timing for the denial. The evidence suggests that she was recommended for a position in 1994, well before she complained to CCPS or to the EEOC. (Carmean Dep. at 7–8.) The record does not indicate when her promotion was denied. To the extent that the failed promotion rests on Nye's being present at a meeting in which Carmean refused to hire Melanie Hawkins, Pl.'s Opp'n at 27, Nye has not proven that she engaged in a protected activity. Nye's fourth theory, the reaction of the administration to her March 1998 speech, lacks causation. Dr. Wheeler stated that Nye was presenting "obsolete" materials and advocating a disfavored technique for helping students. (Wheeler Dep. at 35.) She was disturbed by the speech and notified Roberts. (Wheeler Dep. at 35.) Nye admits that Dr. Wheeler probably did not know about her sexual harassment complaint. (Nye Dep. at 400.) Nye's fifth theory, based on her removal from committee responsibilities, lacks causation. Nye has not presented specific evidence that Carmean removed or asked Nye to resign from the crisis team. Carmean denies asking her. (Carmean Dep. at 105–09.) Nye states at most that "essentially Dr. Carmean had taken away ... the responsibilities of the

Crisis Intervention Team leader." (Nye Dep. at 387.) Carmean thus removed the *position,* which affected the other leader, Bob Giraldi, as well. (Nye Dep. at 388.) This effectively rebuts an inference of causation. With regard to the Assistant Principal's Committee, Dr. Wheeler appointed Nye to the committee in September of 1997 and removed her on February 4, 1998. (Nye Dep. at 400.) Both of these events occurred after Nye's internal complaint and OCR letter, rebutting causation. Nye's sixth theory, based on alleged increased "surveillance" of her activities, fails for want of an adverse employment action. Nye presents evidence regarding only one incident—John Kelly and Carmean's questioning her partial absence from an all day meeting at Sandy Cove. (Nye Dep. at 506–07; Kelly Dep. at 26–29; Memo from Carmean to Nye of 3/2/98.) Kelly's inquiries about her presence in the school parking lot and Carmean's follow-up memo do not constitute an adverse employment action. Nye's seventh theory, based on criticism about her role in releasing a former student ("James") from special education, fails for want of an adverse employment action. Nye has presented no evidence that Dr. Carmean took any employment action against her. The evidence in the record intimates only that Nye apparently be-

15, 1998 reprimand encompasses two separate instances of alleged retaliation. First, the letter reprimands Nye for confronting another psychologist, Melissa Weyl, concerning a former student. Second, it reprimands her for causing a disruption in the workplace by notifying the EEOC of Harris' alleged harassment of Leslie Rink. I treat both of these under the *McDonnell Douglas* proof scheme.[6] To prove a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in protected activity; (2) an adverse employment action was taken against her; and (3) there was a causal connection between the first two elements. *Munday v. Waste Mgmt., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997). With regard to both alleged retaliation incidents, I need reach only the question of whether the resulting reprimand was an adverse employment action.

■■■ I hold on the record before me that the reprimand was not an adverse employment action. In order to qualify as adverse, an employer's action must "adversely affect[ ] 'the terms, conditions, or benefits' of the plaintiff's employment." *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir.2001) (quoting *Munday*, 126 F.3d at 243).[7] Reprimands do not automatically affect the terms and conditions of employment. *See, e.g., Nelson v. Univ. of Maine Sys.*, 923 F.Supp. 275, 281 (D.Me. 1996) (noting that plaintiffs relying on "more subtle employment actions, such as criticisms, reprimands, defamation and other reputational injuries," still must show "employment injury"). *But see*

---

lieved that she was *going to be* criticized about her role in releasing the student. (Nye Dep. 430–31.) As a result, she confronted another psychologist, Melissa Weyl, about the student, giving rise to the reprimand discussed above. Nye's eighth theory, her failure to be considered for the psychologist coordinator position, lacks causation. The decision to limit the position to twelve-month personnel was approved by a panel of psychologists at a meeting that Nye attended, Nye Dep. at 285–90, and it affected other employees, as well. (Notes of School Psychologist's Meeting of 10/17/96; Nye Dep. at 285–90.)

6. With regard to the second incident, one could argue that Nye has presented direct evidence of retaliation. The reprimand letter states that Nye was being reprimanded for her "letter in which [she] alleged that Ms. Leslie Rink, School Psychologist, was subjected to sexual harassment." (Letter from Carmean to Nye of 4/15/98.) The defendants argue, however, that Nye was not disciplined for communicating with the EEOC, but rather for doing so without Rink's permission and, indeed, without even her awareness that Nye had overheard her mention the harassment. There is no evidence that CCPS issued the reprimand for *both* reasons, thus giving rise to a mixed-motive analysis. Rather, the proper inquiry is whether the "workplace disruption" justification is really pretext for discriminatory retaliation. This, of course, is the very aim of the *McDonnell Douglas* inquiry.

7. Prior to *Von Gunten*, there was some dispute about whether a retaliation claim could be based only on "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *See Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981). Although a circuit split exists on whether the *Page* standard, which construes 42 U.S.C. § 2000e-16(a), applies to the anti-retaliation provision found in 42 U.S.C. § 2000e-3(a), *see Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 n. 11 (4th Cir.2000), the Fourth Circuit has squarely addressed the appropriate standard in *Von Gunten* by holding that Title VII does not require an "ultimate employment action," but does require an action that alters the terms, conditions or benefits of employment. *Von Gunten*, at 863–66. Because *Von Gunten* was decided so recently, there has been some post-deadline skirmishing between the parties. I deny the Defendants' Motion for Leave to File A Response to Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Partial Summary Adjudication. Moreover, although the defendants acted appropriately in writing a letter noticing the case, I have not relied in any respect on the arguments presented in the remainder of their March 22, 2001 letter.

*Johnson v. DiMario,* 14 F.Supp.2d 107, 110–11 (D.D.C.1998) (finding that a written warning for signing another employee's leave slip qualifies as an adverse employment action). Such an automatic rule would inhibit criticism and communication between supervisors and employees, which are "normal incident[s] of the working relationship." *Nelson,* 923 F.Supp. at 281–82. Moreover, absent evidence on the impact of a reprimand, finding injury would require speculation as to the probable effects of criticism. Nye has not presented evidence that her injury is anything but reputational. The reprimand letter asked only that Nye correct her behavior.[8] It did not state that it would lead to her termination or demotion or a decrease in pay. (Letter from Carmean to Nye of 4/15/98.) Nor apparently did it hinder her ability to obtain other employment. (Nye Dep. at 531.) Nye has offered no other evidence discussing the effect of a reprimand in the CCPS system. She has not presented sufficient evidence showing that her reprimand constitutes an adverse employment action in the context of CCPS's system of employment practices and procedures.

■ The poor evaluation that Nye received in June of 1998 fails for the same reason. *Von Gunten* held that an employer's downgrading of an evaluation that had no "practical consequences" on the plaintiff's employment did not qualify as an adverse employment action. 243 F.3d at 868. Carmean stated that five unsatisfactory ratings would not be a basis for termi-

nation and that the purpose of the lower evaluation was to get improvement.[9] (Carmean Dep. at 157.) It is worth pointing out that the evaluations are negative only with regard to categories dealing with "interpersonal relationships." (Evaluation of 6/15/98.) In other categories, Nye largely agreed with Carmean's assessment. *Id.* Accordingly, Nye has not presented sufficient evidence to show that the 1998 evaluation was an adverse employment action.

### III.

■ Nye also claims that she was constructively discharged in violation of Title VII. Constructive discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Holsey v. Armour & Co.,* 743 F.2d 199, 209 (4th Cir.1984) (citation omitted); *Munday,* 126 F.3d at 244 (citation omitted). A plaintiff must prove two elements: deliberateness of the employer's action and intolerability of working conditions. *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985). Although this circuit requires proof of the employer's specific intent to force an employee to leave, intent can be inferred from circumstantial evidence. *Bristow,* 770 F.2d at 1255. Nye has presented no evidence indicating that anyone ever asked her to resign or suggested that she leave. Nor is this intent inferable from the actions of CCPS supervisors. Roberts authorized an investigation after Nye's August 1996 complaint.

---

8. The letter stated: "You are expected to comply to the same level of professionalism as all other employees. Both the Weyl and Rink incidents focus on poor interpersonal relations. In the future your association with your colleagues must adhere to high professional standards of conduct." (Letter from Carmean to Nye of 4/15/98.)

9. Carmean did state that if her behavior "continued to progress the way it was progressing, it could have ultimate[ly] lead to dismissal." (Carmean Dep. at 157–58.) This is too speculative a statement, given the absence of other evidence explaining the evaluation process and its effect, for a reasonable fact finder to conclude that this decision was an adverse employment action.

 

Although Nye may disagree with the conclusions reached by Carmean and Chapman, they spoke with necessary witnesses and responded to suggestions for further investigation by Nye's attorney. (Carmean Dep. at 60–61, 64–65; Chapman Dep. at 6–10, 31.) Moreover, Nye was transferred away from Harris. Without more thoroughly evaluating the investigation, it is clear that at a minimum it did not have as its design forcing Nye to leave. Moreover, Nye has presented no evidence that the poor evaluation and written reprimand brought her close to discharge.[10] In the evaluation, Carmean wrote that the problems with other psychologists "need[ed] to be corrected," thus assuming a future relationship. (Evaluation of 6/15/98.) Accordingly, I find that no reasonable juror could conclude that CCPS acted with the intention of causing Nye to leave her position.

An order effectuating the rulings made in this memorandum is being entered herewith.

### ORDER

For the reasons stated in the foregoing memorandum, it is, this 4th day of April, 2001, hereby ORDERED that:

1. The Motion of Defendants Carl Roberts and the Board of Education of Cecil County to Dismiss and/or, Alternatively, for Summary Judgment is GRANTED;

   a. Count I of the Amended Complaint is dismissed;

   b. Judgment shall be entered for the defendants on count II of the Amended Complaint.

2. Defendant Carl Roberts' Motion to Dismiss or, in the Alternative, for Summary Judgment is GRANTED;

3. The Plaintiff's Motion for Partial Summary Adjudication is DENIED;

4. The Defendants' Motion to Strike Plaintiff's Responses to Defendants' Allegations of Material Undisputed Facts is DENIED;

5. Defendants' Motion to Enlarge Page Limitation for Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment is GRANTED; and

6. The Defendants' Motion for Leave to File A Response to Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Partial Summary Adjudication is DENIED.

---

**10.** At Nye's 1998 evaluation meeting, and in light of previous friction between Carmean and Nye, Carmean arranged to have Dr. Wheeler attend as a "neutral observer" to remember what transpired. (Carmean Dep. at 159–60.) This is not an action consistent with an intent to force an employee to leave.