Aman C. CHIKA, Plaintiff

v.

PLANNING RESEARCH
CORP., Defendant

No. CIV. AMD 00–3689.

United States District Court,
D. Maryland.

Jan. 8, 2002.

Nathaniel David Johnson, William C. Lindsey, ND Johnson and Assoc., Brandywine, MD, for Plaintiff.

Robert Ross Niccolini, McGuireWoods LLP, Baltimore, MD, Stephen W. Robinson, McGuireWoods LLP, McLean, VA, for Defendant.

## MEMORANDUM

DAVIS, District Judge.

The plaintiff, Aman C. Chika ("Chika"), an African–American male, instituted this

employment discrimination lawsuit against his employer, defendant Planning Research Corporation ("PRC"), alleging race discrimination and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) *et seq.*, and 42 U.S.C. § 1981. Now pending is PRC's motion for summary judgment.[1] Having considered the parties' memoranda and exhibits, I am satisfied that no hearing is necessary. Local Rule 105.6. For the reasons explained below, I shall grant PRC's motion for summary judgment as to all claims.

(i)

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

(ii)

As a preliminary matter, PRC requests that unauthenticated documents relied upon by Chika be excluded from consideration.[2] "To be admissible at the summary

---

**1.** PRC has also filed a motion to place under seal certain documents plaintiff submitted with his opposition to the motion for summary judgment and for sanctions in consequence of the resulting violation of a stipulated protective order previously entered by the court. Counsel for plaintiff has stated that he simply made a mistake in failing to submit the material without a motion to seal.

**2.** The contested documents are as follows: (1) Offer of employment from PRC to Chika dated March 4, 1997, attached as exhibit A; (2) portions of the PRC/NOAA document, attached as exhibit D; (3) PRC position description for Electronic Technician Trainee, attached as exhibit E; (4) PRC position description for Electronics Technician Engineering Technician, attached as exhibit F; (5) PRC position description of Lead Electronics Engineering Technician, attached as exhibit G; (6) letter from PRC to the Equal Employment Opportunity Commission ("EEOC"), attached as exhibit H; (7) memorandum from

judgment stage, 'documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).' " *Orsi v. Kirkwood,* 999 F.2d 86, 92 (4th Cir.1993) (quoting, 10A CHARLES A. WRIGHT, ARTHUR R. MILLER and MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE, § 2722 at 58–60 (1983 & 1993 Supp.)); *see also Miskin v. Baxter Healthcare Corp.,* 107 F.Supp.2d 669, 671 (D.Md.1999) (noting that "unsworn, unauthenticated documents cannot be considered on a motion for summary judgment"). Since the filing of PRC's motion to strike, however, Chika has submitted an affidavit attesting to the authenticity of the documents stating that "the overwhelming majority of the documents were produced by defendant in response to plaintiff's discovery requests and at depositions." In light of this factor and because PRC does not contend that the documents are other than what they purport to be, I shall deny PRC's motion to strike. *See* Fed.R.Evid. 901(b)(4) (appearance and contents of documents, taken with the circumstances, establish authenticity).

### (iii)

I shall now turn to the facts. In reviewing the merits of PRC's motion for summary judgment, I shall view the facts in the light most favorable to Chika, the non-movant.

PRC provides information technology services, primarily to the federal government. Under one of its contracts, PRC operated and maintained the equipment used to process and generate weather satellite information for the National Oceanic & Atmospheric Administration ("NOAA") at a facility in Suitland, Maryland. The NOAA contract incorporates wage determinations issued by the U.S. Department of Labor, which sets forth minimum hourly rates that are required to be paid to non-exempt employees under the Service Contract Act. The NOAA contract also delineates the type and number of positions on the project according to wage determination classifications. To remain competitive in the bidding process, PRC proposed to pay all non-exempt employees on the NOAA contract at the rate set by the area wage determination, and upon the award in favor of PRC, the company performed the contract on that basis. Salary increases for non-exempt employees, therefore, occurred on the NOAA contract only when the Department of Labor issued an increased area wage determination.

In December 1996, Chika interviewed with Russ Dyson ("Dyson"), the Hardware Engineering Manager on PRC's NOAA contract at the Suitland facility. In March 1997, Dyson, after consulting with Larry Montross ("Montross"), the program manager, hired Chika as an Electronic Technician I ("Technician I"), a non-exempt position.[3] Chika commenced his employment on March 24, 1997. Chika's responsibilities included assisting senior technicians with hardware repairs and maintenance issues. Chika alleges that within six

Chika dated May 27, 1999, attached as exhibit I; (8) memorandum from Chika dated September 3, 1999, attached as exhibit J; (9) Chika's statement to EEOC dated August 24, 1999, attached as exhibit K; (10) memorandum from Chika concerning alleged harassment/reprisal, attached as exhibit L; (11) memorandum from Chika dated January 21, 2000, attached as exhibit M; (12) memorandum from Chika dated February 19, 2000, attached as exhibit N; (13) letter from Chika to EEOC dated February 14, 2000, attached as exhibit O; (14) PRC salary listing, attached as exhibit V; (15) alleged posting, attached as exhibit Z; and (16) PRC internal complaint policy, attached as Exhibit 1.

3. Chika states that he was initially hired as an Electronic Technician Trainee. For the purposes of this motion, I shall refer to Chika as an Electronic Technician I.

months he began handling repairs with no supervision. Later, when an Electronic Technician III ("Technician III") was promoted, PRC began delegating higher-level duties to him. These higher-level duties included attending meetings on behalf of Dyson, recommending new tools, and training a newly-hired technician.

In May 1999, after performing these higher-level duties on a consistent basis, Chika requested a promotion to the position of Electronic Technician II ("Technician II"). PRC, however, denied Chika's request because no Technician II positions existed under the NOAA contract and the creation of such a position was not necessary. Plainly disappointed and unhappy with PRC's response, Chika admits that, after his request for a promotion was denied, he began limiting his job tasks to Technician I level duties only. He informed PRC that he would no longer attend meetings on behalf of Dyson because "that is what a Technician Level III's job was." *Chika's Dep.* at 103–104.

In due course thereafter, Chika alleges, Montross began to harass him. Chika maintains that Montross would follow Chika around the work site and eavesdrop on his conversations. Montross, according to Chika, would interrupt his conversations with other African–American employees. On several occasions, Montross questioned Chika about repairing a computer for Shirley Page ("Page"), an African–American secretary. Chika also maintains that throughout his employment he observed non African–American employees receiving bonuses, training, and promotions. Chika also contends that he sought and was repeatedly denied job-related training from PRC.

In August 1999, Chika submitted an internal complaint alleging discrimination on the basis of race. On September 29, 1999, Chika filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). Chika also alleged employee timecard fraud, as well as other employee misconduct, e.g., alcohol consumption on the job. As a result of Chika's timecard abuse allegations, PRC conducted an internal audit in October 1999; specifically, the company interviewed numerous employees about the allegations.

Chika alleges that after he filed the EEOC charge, the company retaliated against him. Specifically, Chika cites two verbal reprimands that he received in October 1999. Chika also alleges that his activities were closely monitored and he was repeatedly questioned about his work. After he filed his charges, Chika alleges, co-workers began to harass him by making unkind remarks about him and refusing to work with him. In March 2001, Jack Phegley ("Phegley"), the Operations and Maintenance Manager, transferred Chika to the night shift.

Chika timely instituted this action seeking redress for his alleged employment injuries.

(iv)

■■■ In the absence of direct or circumstantial evidence of a discriminatory motive, claims involving disparate treatment involving a distinct "employment injury" are analyzed for summary judgment purposes under the familiar *McDonnell Douglas* scheme common to discrimination claims. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir.), *cert. denied*, 531 U.S. 875, 121 S.Ct. 181, 148 L.Ed.2d 125, *reh'g denied*, 531 U.S. 1031, 121 S.Ct. 613, 148 L.Ed.2d 524 (2000), *citing (McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). The Supreme Court has held that the well-known *McDonnell Douglas* proof scheme also applies to claims brought under 42 U.S.C. § 1981, *see Patterson v. McLean*

*Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), and the Fourth Circuit has stated "the framework of proof for disparate treatment claims—that is, whether the employer intentionally discriminated against the employee—is the same for actions brought under Title VII or § 1981." *Mallory v. Booth Refrigeration Supply Co.,* 882 F.2d 908, 910 (4th Cir.1989).

▪ Under this scheme the plaintiff must first demonstrate a prima facie case of discrimination. Specifically, to make out a prima facie case of disparate treatment, plaintiff must produce evidence to show that

1. he is a member of a protected class;
2. he was performing his duties in a satisfactory manner;
3. he was subjected to an adverse employment action; and
4. that circumstances surrounding the adverse employment action rationally support the inference that the adverse employment action was motivated by unlawful considerations.

*See Ennis v. National Ass'n of Business and Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir.1995); *Tuck v. Henkel Corp.,* 973 F.2d 371, 375 (4th Cir.1992)(age discrimination), *cert. denied,* 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993), *abrogated on other grounds in O'Connor v. Consol. Caterers Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This initial showing requires the plaintiff to produce "a set of facts which would enable the fact-finder to conclude with reasonable probability that *in the absence of any further explanation,* the adverse employment action was the product of [race or sex] discrimination." *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1315 (4th Cir.1993) (emphasis in original).

▪ Once the plaintiff establishes a prima facie case, a presumption of discrimination arises and the burden of production is placed on the employer to articulate a legitimate nondiscriminatory reason for the adverse employment decision. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citing *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089 (1981)). Because the employer's burden is one of production and not of persuasion, it "is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *E.E.O.C v. Clay Printing Co.,* 955 F.2d 936, 941 (4th Cir.1992) (quoting *E.E.O.C. v. Western Electric Co. Inc.,* 713 F.2d 1011, 1014 (4th Cir.1983)). If the employer meets this burden, the presumption of discrimination is eliminated, and the plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the employer's nondiscriminatory reasons are pretextual and that the adverse employment action was actually taken because of the employee's race or sex. *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742.

▪ The Supreme Court clarified the plaintiff's burden at the pretext stage in *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The Court reiterated that evidence of pretext, combined with the plaintiff's prima facie case, does not compel judgment for the plaintiff, because "[i]t is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Id.* (quoting *Hicks,* 509 U.S. at 519, 113 S.Ct. 2742). However, *Reeves* made plain that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier

of fact to conclude that the employer unlawfully discriminated." *Id.*

Here, Chika alleges that PRC discriminated against him on the basis of race by failing to promote him, failing to provide him with equal training opportunities, and by paying him in a disparate manner. I will examine each of these claims in turn.

*Denial of Promotion*

■ Chika claims that PRC intentionally discriminated against him by failing to promote him to the positions of Technician II and/or III. To set forth a prima facie case of promotion discrimination under *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817, Chika must produce evidence establishing the following four separate elements:

1. [he] is a member of a protected class;

2. [he] applied for the position in question;

3. [he] was qualified for the position; and

4. [he was denied a promotion] under circumstances giving rise to an inference of unlawful discrimination.

*Amirmokri v. Baltimore Gas & Electric Co.,* 60 F.3d 1126, 1129 (4th Cir.1995) (citing *Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994)). Although "the burden of establishing a prima facie case of disparate treatment is not onerous," *Brinkley–Obu v. Hughes Training, Inc.,* 36 F.3d 336, 343 (4th Cir.1994) (citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)), as a matter of law, Chika has failed to establish a prima facie case of race discrimination as to his failure to promote claim.

■ First, Chika has failed to establish the third element of his prima facie case— that he was qualified to be promoted to either the position of Technician II or III. Chika provides no argument or evidence on this point. Chika failed to provide the typical duties of a Technician II or the minimum requirements for such a position, and although Chika submitted the job description and requirements for the Technician III position, Chika failed to establish that he met the requirements listed.[4]

Moreover, Chika's prima facie case is deficient in that Chika has failed to project sufficient evidence that PRC failed to promote him "under circumstances giving rise to an inference of unlawful discrimination." *Amirmokri,* 60 F.3d at 1129. Chika first maintains that the alleged availability of a Technician III position and PRC's failure to promote him to such a position supports an inference of discrimination. Chika, however, is unable to demonstrate that a Technician III position was available.[5] Chika argues that there was one vacancy for the position of Technician III because the NOAA contract required four such positions and only three positions were filled. For support of this contention, Chika cites a document alleged to be portions of the NOAA contract. Exhibit D of *Pl.'s Op. to Def.'s Mot. Summ. J.* Chika contends that the document mandates "at least four (4) Electronic Technicians III to work during the scheduled shift" and that at the time that he sought promotion, one of the posi-

---

4. The requirements for a Technician III include a "minimum of three years directly related, hands on experience, plus two-year technical degree (or equivalent experience)" and "military training, especially 'A' and 'C' schools, highly recommended."

5. I would also note that with respect to the Technician III position, the unavailability of such a position would appear to defeat Chika's failure to promote claim at the outset. However, as neither party has briefed this deficiency in the prima facie case, I shall not reach this issue.

tions had been vacant for almost 19 months. *Pl.'s Opp.* at 9. This document, however, falls far short from supporting Chika's contention. The document: (1) does not appear to be the final contract; rather, the document appears to be a proposal by PRC; (2) contains no mandates, only recommendations; and, (3) does not appear to recommend the staffing of four Technician III positions; rather, the document proposes three shifts with one Technician III assigned to each shift. Moreover, the undisputed facts do not suggest there existed a "vacant" Technician III position, as PRC never hired a fourth Technician III.

Chika also argues that PRC's failure to post job vacancies specifically at the work site allows for an inference of discrimination. More specifically, Chika argues that an inference of racial animus should be drawn because PRC consistently failed to post vacancies and regularly selected "non-Black" employees to be promoted to non-posted positions. *Pl.'s Opp.* at 10. Chika fails, however, to project evidence supporting a fact critical to his theory—that the failure to post the vacancies at the actual work site prevented employees from accessing or obtaining information about vacant positions, or that it led to disparate promotions. The documents in the record demonstrate that PRC regularly posted all positions on its internal web site and notified all PRC employees of vacancies through e-mails. Although PRC concedes that four positions were never posted at the NOAA work site, the record shows indisputably that vacancies were posted either on the web site or sent via internal e-mail to all employees. Under the circumstances here, no more is required in the absence of any showing that such means were not reasonably likely to provide actual notice of vacancies to all interested persons without regard to race.

In a final attempt to assemble facts sufficient to support an inference of discrimination, Chika strains to attach racial animus to PRC through a lone comment by Phegley, Chika's immediate supervisor as of March 2001. Phegley stated that he had "good luck in hiring Asian employees." *Phegley Aff.* at ¶ 10. Chika argues that based on this comment, an inference should be drawn that PRC took some affirmative conduct to alter the promotion process. Even assuming that this comment qualifies as a discriminatory statement, a dubious assumption at best, Chika fails to offer the necessary "nexus ... between the alleged discriminatory [statement] and any of the employment decisions made by the [decision maker.]" *See EEOC v. Clay Printing Co.*, 955 F.2d 936, 942 (4th Cir. 1992). Phegley did not become Chika's immediate supervisor until March 2001; manifestly, Phegley was not the decision maker with regard to Chika's denied promotions. In short, this "evidence" lacks substantial probative value on this record. Accordingly, because Chika has failed to marshal sufficient evidence to establish his prima facie case, I shall grant PRC's motion for summary judgement with respect to this claim.[6]

*Disparate Compensation*

 To establish a prima facie case of race discrimination with respect to salary

---

**6.** Even if Chika somehow were deemed to have established his prima facie case with regard to his failure to promote claim, the outcome would be the same because he nonetheless would not be able to generate a dispute of material fact as to PRC's nondiscriminatory legitimate reason for declining to upgrade his position. Specifically, plaintiff has adduced no evidence to show that PRC's legitimate nondiscriminatory reason for rejecting his promotion request ("no vacancy") is a pretext for discrimination. Other than his own unfounded speculation, plaintiff has offered the court no evidence to support the claim that his non-promotion was related to his race.

and compensation, Chika must establish that he is a member of a protected class, that his job was similar to other jobs occupied by those outside the class, and that he receives a lower wage. *See, e.g., Brinkley–Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir.1994). Chika, however, has failed to assert a separate claim of disparate pay. Instead, Chika argues that PRC implemented a discriminatory method of increasing salaries by effecting disparate promotions. Therefore, Chika's argument is merely a variation on his failure to promote claim. Chika concedes as much in his opposition. *Pl.'s Opp.* at 14 ("[T]herefore, Mr. Chika's allegations of discriminatory promotion practices at the NOAA site are inextricably intertwined with his claims of failure to pay."). This claim fails for the same reasons.

In any event, Chika has failed to establish that any similarly situated individuals outside of his protected class were treated more favorably than he. It is undisputed that all non-exempt employees of PRC on the NOAA contract were paid pursuant to the terms of the area wage determination, and that these employees received salary increases only when the U.S. Department of Labor issued an increased wage determination. Accordingly, Chika, as a non-exempt employee on the NOAA contract, was paid pursuant to the area wage determination, as incorporated into the NOAA contract, and could therefore receive salary increases only when the U.S. Department of Labor issued an increased wage determination. Chika concedes that he was unaware of any employee who was paid more than the salary set by the area wage determination. *Pl.'s Dep.* at 54. Moreover, Chika admits that he was unaware of any PRC employee with the same wage determination designation of Technician I that was paid more than he. *Pl.'s Dep.* at 52. Consequently, Chika is unable to establish a prima facie case of racial

discrimination with respect to salary. Accordingly, for all these reasons, I shall grant PRC's motion for summary judgment with respect to Chika's disparate compensation claim.

### Denial of Training Opportunities

■ Chika alleges that he was subjected to disparate treatment because PRC denied his training requests. More specifically, Chika alleges that PRC denied him two opportunities: (1) cross-training and (2) receiving increased tuition reimbursement. Chika's claims fail as a matter of law, however, because he has projected no evidence that he has suffered any adverse employment action.

■ It is well established that Title VII's protections extend only to adverse employment actions. *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) ("[E]mployment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred."), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). In *Page v. Bolger*, the Fourth Circuit examined what constitutes an "adverse employment action" and explained that inquiries "consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting and compensation." 645 F.2d 227, 233 (4th Cir.) (en banc), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981). The Court further explained that "[a]mong the myriad of decisions constantly being taken at all levels and with all degrees of significance in the general employment contexts covered by Title VII there are certainly others than those we have so far specifically identified that may be so considered, for example, entry into training programs." *Id.* (citation omitted). Case law is clear,

however, that to establish an adverse employment action there must be "evidence that the terms, conditions, or benefits of employment were adversely affected." *Munday v. Waste Management of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir.1997), *cert. denied*, 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998). Therefore, as I stated in *Settle v. Baltimore County*, "[a]lthough actions short of termination may constitute an adverse employment action within the meaning of [Title VII,] ... not everything that makes an employee unhappy is an actionable adverse action." 34 F.Supp.2d 969, 989 (D.Md.1999) (citation and internal quotation marks omitted), *aff'd without op.*, 203 F.3d 822 (4th Cir.2000), *Harris v. Earp*, 203 F.3d 820 (4th Cir.2000).

In the instant case, Chika claims that the denial of training opportunities constitutes an adverse employment action cognizable under Title VII. Here, Chika specifically claims that PRC's denial of his request to cross-train on company time and PRC's denial of his request for an increase in tuition reimbursement constitute adverse employment actions. The summary judgment record, however, reflects that PRC afforded Chika numerous training opportunities. During Chika's employment, PRC paid for Chika to attend A+ certification training, the industry standard for computer repair. PRC also provided Chika with access to online training over the company network. Specifically, this system included training in Windows Operating Systems and Networking and in UNIX, as well as 500 other courses. Chika himself concedes that he was given access to the following: (1) PRC's tuition reimbursement program to subsidize his education; (2) numerous available on-line training courses over PRC's computer network; and (3) the UNIX training he had been requesting. *Pl.'s Opp.* at 16. Against this backdrop of training opportunities provided by PRC,

Chika has failed to establish how the denial of two training requests altered the terms and conditions of his employment.

Even if I were persuaded that the denial of two training requests could be found by a reasonable juror to constitute an adverse employment action, and I am not, Chika has failed to establish that the denial occurred under circumstances giving rise to an inference of unlawful race discrimination. Chika alleges that PRC treated individuals outside of his protected class differently than he; specifically, Chika alleges the following two instances of disparate treatment: (1) PRC provided Bonnie Hash ("Hash"), a computer programmer, with an increase in tuition reimbursement in 1994; and (2) PRC permitted William Hart ("Hart") to cross-train. *Pl.'s Opp.* at 16–17. These allegations, however, are utterly insufficient to justify an inference of discrimination. First, Chika fails to establish the race of both Hart and Hash. Without such evidence, Chika is unable to demonstrate that individuals outside of his class were treated more favorably. *Cf. Fisher v. Maryland Department of Housing & Community Development*, 32 F.Supp.2d 257, 262 (D.Md.), *aff'd*, 166 F.3d 1208 (4th Cir.1998) (explaining that evidence of discriminatory motive is critical, although in some cases it can be inferred from the mere fact of differences in treatment).

Second, Chika fails to submit any evidence buttressing the alleged disparities. With regard to Hash's alleged tuition increase in 1994 the relevant testimony reads:

Q: How do you know [tuition reimbursement was increased] for Ms. Hash?

A: From people talking.

*Pl.'s Dep.* at 139.

Third, Chika fails to establish that Hart, as a Technician III, is a proper comparator

with regard to cross-training opportunities or that Hash is a proper comparator with respect to tuition reimbursement. Consequently, Chika has failed to establish that similarly situated individuals outside of his protected class were treated more favorably than he.

Accordingly, I shall grant summary judgment on Chika's claim relating to PRC's alleged failure to train.

(v)

■ In order to establish a prima facie case of retaliation, a plaintiff must prove:

(1) He engaged in protected activity under Title VII

(2) The employer took an adverse employment action against him; and

(3) There is a causal connection between the protected activity undertaken by plaintiff and the adverse employment action taken by the defendant.

See Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir.2001). The defendant may then rebut the prima facie case by showing that there was a legitimate non-discriminatory reason for the adverse action. See Munday v. Waste Management of N. Am., Inc., 126 F.3d 239, 242 (4th Cir.1997), cert. denied, 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998). The burden then shifts back to the plaintiff to show that those reasons are pretextual.

■ To be considered an adverse action under the second prong of the prima facie case, an incident must have "adversely affected 'the terms, conditions, or benefits' of plaintiff's employment." Von Gunten, 243 F.3d at 863 (citation omitted). Adverse employment actions include retal-

iatory harassment, but only if that act or harassment results in an adverse effect on the "terms, conditions, or benefits" of employment. Von Gunten v. Maryland Dep't of Env't, 68 F.Supp.2d 654, 662 (D.Md. 1999) (" '[E]vidence that the terms, conditions, or benefits of employment were adversely effected' is the sine qua non of an 'adverse employment action.' "), aff'd, 243 F.3d 858 (4th Cir.2001) (quoting Munday, 126 F.3d at 243).

Chika maintains that the following conduct by PRC constitutes adverse employment actions: (1) PRC reprimanded Chika for poor performance and for reviewing other employees' time sheets; (2) PRC repeatedly questioned Chika about his work and closely monitored his actions; (3) PRC transferred Chika to the night shift; and (4) co-workers engaged in retaliatory harassment creating a hostile work environment. I will consider each in turn.

*Reprimands*

■ Chika contends that two verbal reprimands he received in October 1999 constitute adverse employment actions.[7] Chika received a verbal reprimand on October 7,1999, allegedly for poor work performance. On October 21, 1999, Chika received a verbal warning for his alleged review of other employees' time cards. Reprimands, however, do not automatically constitute adverse employment actions, as they do not always affect the terms and conditions of employment. Nye v. Roberts, 159 F.Supp.2d 207, 213–14 (D.Md. 2001) (citation omitted). Indeed, such an automatic rule would inhibit criticism and communication between supervisors and employees. Id. at 214 (citation omitted);

7. Chika alleges that he received another reprimand on or about January 20, 2000. Pl.'s Opp. at 20. The record, however, does not support this allegation. Rather, on or about January 2000, Chika received a memorandum concerning shift procedures. This memoran-

dum was not addressed specifically to Chika and was also placed in other employees' bins. Mem. from Chika to Patsy Wolf, Principal Human Resource Specialist, attached to Pl.'s Opp. as Ex. M.

*but see Johnson v. DiMario,* 14 F.Supp.2d 107, 110–11 (D.D.C.1998) (finding that a written warning for signing another employee's leave slip qualifies as an adverse employment action).

In the instant case, Chika fails to project any evidence concerning the effect of the two verbal reprimands. Chika does not state that either reprimand could lead to his demotion or termination. Nor does Chika establish that the two verbal reprimands had any impact on his job performance or whether the reprimands were documented in his personnel file. From all that appears, the reprimands do not appear to qualify as "adverse employment actions" within the contemplation of Title VII. Even if I were persuaded that these two incidents constituted adverse employment actions, however, Chika's claim would still fail because Chika has failed to rebut PRC's legitimate, non-discriminatory reasons for these reprimands.

### Supervisory Conduct

■■■ Similarly, Chika has failed to project evidence that his supervisors' alleged behavior toward him resulted in an adverse employment action. Chika alleges that his activities were closely monitored and he was repeatedly questioned about his work after he filed his charge of discrimination in September 1999. While this behavior may have been frustrating and annoying, Chika fails to establish how this behavior changed his employment status. "[A retaliatory] animus cannot be inferred from the day-to-day conduct of supervisors that [plaintiffs] may deem inconvenient, inconsiderate or insufficiently solicitous." *Settle,* 34 F.Supp.2d at 993 (internal quotations omitted) (quoting *Copeland v. Sears, Roebuck and Co.,* 25 F.Supp.2d 412, 418 (S.D.N.Y.1998)). Increased tension or unpleasant personal relationships also do not rise to the level of actionable retaliatory adverse action. *See Heno v. Sprint/United Management Co.,* 208 F.3d 847, 857–58 (10th Cir.2000) (no adverse action where supervisors acted in a rude manner toward plaintiff and a transfer was suggested).

### Transfer to Night Shift

Chika next maintains that his transfer to the night shift constitutes an adverse employment action. Again, Chika completely fails to assemble evidence that the transfer had an impact on his job status or the terms and conditions of his employment. Chika still worked the same job, maintained the same title, and kept the same responsibilities. In addition, the transfer did not result in diminution in pay. To the contrary, Chika received a higher shift differential for working nights. While inconvenient, such a transfer does not automatically constitute an adverse employment action.

Moreover, Chika has failed to link the filing of the EEOC complaint in September 1999, or any of his amended charges[8] to his transfer to the night shift. Here, almost 18 months elapsed after the filing of the EEO complaint before the transfer in question. Further, Chika failed to establish that Phegley, Chika's supervisor as of March 2001 and the individual who transferred Chika to the night shift, knew that any discrimination charges had been filed. *See Tinsley v. First Union Nat. Bank,* 155 F.3d 435, 444 (4th Cir.1998) (no causal connection shown where there was no evidence that a supervisor knew that plaintiff had filed a complaint). Nor did Chika supply any evidence to rebut Phegley's testimony by affidavit that at the time

---

**8.** Chika filed two amended charges on the following dates: December 1999 and February 2000.

of the transfer he was completely unaware that Chika had filed any internal or external complaint against PRC. *Phegley Aff.* at ¶ 7–9. Chika is therefore unable, as a matter of law, to establish that the alleged adverse action is linked to his protected activity.

### Co-worker Harassment

Finally, Chika asserts that PRC subjected him to retaliatory harassment creating a hostile work environment. In *Von Gunten,* the Fourth Circuit recognized that retaliatory harassment can constitute an adverse employment action, *see Ross v. Communications Satellite Corp.,* 759 F.2d 355, 363–64, (4th Cir.1985), *overruled on other grounds,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268, (1989), if such harassment adversely affects the "terms, conditions, or benefits of employment." 243 F.3d 858, 870 (quoting *Munday,* 126 F.3d at 243) (internal quotation marks omitted). Chika's retaliatory harassment claim fails.

■ "For a hostile work environment claim to lie there must be evidence of conduct 'severe or pervasive enough' to create 'an environment that a reasonable person would find hostile or abusive.'" *Von Gunten,* 243 F.3d at 870 (4th Cir.2001)(quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The standard for proving a hostile work environment is intended to be a high one. *Porter v. Nat'l Con-Serv, Inc.,* 51 F.Supp.2d 656, 659 (D.Md.1998) (racial harassment); *see also Norris v. City of Anderson,* 125 F.Supp.2d 759, 766 (D.S.C.2000) (racial harassment). The evidence here falls far short of that required. *Cf., e.g., Collier v. Ram Partners, Inc.,* 159 F.Supp.2d 889 (D.Md.2001)

(denying summary judgment as to claim of hostile work environment where (1) racial epithets were used repeatedly; (2) were coupled with physical threats, and (3) evidence supported conclusion that racial epithets were knowingly tolerated by management); *Demby v. Preston Trucking Co., Inc.,* 961 F.Supp. 873, 881 (D.Md.1997) (denying summary judgment as to hostile work environment claim where (1) racial epithets were used repeatedly; (2) plaintiff recounted several incidents involving disparate treatment; and (3) plaintiff's work space had been vandalized with a painted swastika and a threatening and offensive phrase).

■ Even when Chika's allegations are viewed in their entirety, Chika is unable to meet the high standard required to establish a hostile work environment. Here, the basis for Chika's retaliatory harassment claim rests upon a handful of unkind remarks by co-workers. The severity of these comments was minimal, however. Chika was allegedly called an "asshole," "knucklehead,"and "dick" on a few occasions. Chika also recalls an incident in which a co-worker stated that "he had no life." Such comments, however, are insufficient to establish a hostile work environment. Chika also alleges that a shift supervisor referred to a white co-worker as a "wigger" [9] on one occasion. This one isolated comment, which was not directed towards Chika and was allegedly uttered when Chika himself was not present, is also insufficient to establish a hostile work environment.

Chika also claims that he was harassed when a co-worker repeatedly exhibited violent behavior such as kicking and punching walls and throwing stuff. While such behavior is certainly distressing and has no

---

**9.** "Wigger" is a term used to imply that a white person is trying to act "black." College Slang Research Project *at http://www.csupo-mona.edu/~jasanders/slang/csrpw.htm* (last visited Jan. 7, 2002).

place in a professional environment, Chika has failed to establish whether he felt physically threatened or whether he ever complained about such behavior. The isolated incidents cited by Chika are not sufficient to establish a hostile work environment. Moreover, there is nothing in the record to suggest that Chika considered the incidents severe. Indeed, the record establishes that Chika has remained a PRC employee, working on the same NOAA contract doing essentially the same job for two years following the alleged retaliating actions by his co-workers without ever complaining of the alleged co-worker harassment.

Moreover, even assuming that Chika has projected evidence sufficient to generate a jury question as to whether the workplace environment was actionably hostile, Chika has failed to establish a causal connection between the alleged retaliatory harassment and his complaints of racial discrimination. Although an adverse employment action occurring a few months after the filing of an EEOC complaint might signal a retaliatory act, in the present case, temporal proximity is insufficient to establish a causal connection because there has been no showing that Chika's co-workers knew that he had engaged in protected activity. *See Tinsley,* 155 F.3d at 444 (explaining that there was no causal connection shown where there was no evidence that a supervisor knew that plaintiff had filed a complaint).

▆ Finally, Chika concedes that the alleged harassment did not occur until after PRC put employees on notice of Chika's timecard allegations by conducting an investigation and audit. Chika's relevant testimony is as follows:

A. [T]here was an audit basically across the street at a Days Inn hotel.

Q. This was an audit of allegations of timecard abuse?

A. That's correct, different types of fraud and things like that. We talked about employee intoxication and stuff like that . . . So after the individuals found out that myself and Ms. Page had been responsible for this, then harassment became, came from all other employees as well.

\* \* \* \* \* \*

Q. Were people angry about you making allegations of timecard abuse?

R. Yes.

Q. And you feel because of that anger over you making the allegation of timecard abuse they refused to work with you and called you an asshole and all these things that you have described?

\* \* \* \* \* \*

A. You are asking me to get in someone's head. The only thing I can tell you is that before the investigation, no one treated me that way.

Q. So what you are saying then is before you made the complaints of time card abuse, no one treated you this way, but after you made the complaints and an audit of time card abuse commenced, is when everyone started retaliating against you?

A. As far as harassment, yes.

*Pl.'s Dep.* at 165–66; 180–183. Manifestly, Chika's complaint of timecard abuse is not protected activity.[10]

---

10. Title VII prohibits retaliation against an employee who has "opposed any practice made an unlawful practice by . . . [Title VII]," or who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

Accordingly, for all these reasons, I shall grant PRC's motion for summary judgment on the claim of retaliation.

(vi)

For the reasons above stated, I shall grant PRC's motion for summary judgment with regard to all claims. I shall grant in part and deny in part PRC's motion to seal confidential documents and for sanctions for the inadvertent violation of the stipulated protective order.

ORDER

In accordance with the foregoing Memorandum, it is this 8th day of January, 2002, by the United States District Court for the District of Maryland, ORDERED

(1) The defendant's motion for summary judgment GRANTED; and it is further ORDERED

(2) The defendant's motion to seal confidential documents and for sanctions for violating a protective order is GRANTED IN PART AND DENIED IN PART and the CLERK SHALL PLACE UNDER SEAL THE PLAINTIFF'S OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT; and it is further ORDERED

(3) The Clerk shall CLOSE THIS CASE and TRANSMIT copies of this Order and foregoing Memorandum to all counsel.

...[Title VII]." 42 U.S.C. § 2000e–3(a). As timecard abuse is not made unlawful by Title VII, complaints about such abuse cannot constitute protected activity.