Novella NICHOLS, Plaintiff

v.

HARFORD COUNTY BOARD
OF EDUCATION, et al.,
Defendants

No. CIV. AMD00–3074.

United States District Court,
D. Maryland.

March 18, 2002.

**328**

John M. Singleton, Gabriel Antonio Terrasa, Albertini Singleton Gendler and Darby LLP, Baltimore, MD, for Plaintiff.

Leslie R. Stellman, Hodes Ulman Pessin and Katz PA, Towson, MD, for Defendants.

## MEMORANDUM

DAVIS, District Judge.

Plaintiff, Novella Nichols ("Nichols"), formerly a tenured middle school teacher, has brought this action against her former employer, Harford County Board of Education ("defendant"), the superintendent of schools for Harford County, Jacqueline Haas, former assistant superintendent for human resources, Kathleen Eng, former school principal, Marilyn Owen, and former deputy superintendent, Bob Williams. Broadly construed, Nichols's pro se complaint (on a form made available to pro se litigants by this court) alleges the following claims: (1) employment discrimination based on race and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; (2) employment discrimination based on age under the Age Discrimination in Employment Act of 1967, as amended 19 U.S.C. § 621; (3) employment discrimination on the basis of a disability under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.*; and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

On June 4, 2001, after a hearing, I entered an order dismissing several of Nichols's discrimination claims and all of the claims purportedly asserted against the individual defendants in an individual capacity. Therefore, the only remaining claims are those brought under Title VII and under section 504 of the Rehabilitation Act against the Harford County Board of Education.

Now pending is defendant's motion to dismiss and for summary judgment. The issues have been fully briefed, and no hearing is necessary. For the reasons set forth below, I shall grant defendant's motion for summary judgment. (Defendant's motion to dismiss the Rehabilitation Act claim on the ground of sovereign immunity need not be considered as summary judgment is appropriate on that claim in any event.[1]).

I.

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A

---

1. Recently, in *Biggs v. Board of Educ. of Cecil County*, 2002 WL 370195, —— F.Supp.2d —— (D.Md.2002), Judge Legg held, *inter alia*, the State and its instrumentalities, in particular the Board of Education of Cecil County, were immune from suit under section 504 of the Rehabilitation Act. I need not reach that issue here.

fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indust. Co v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

## II.

Viewing the evidence in the light most favorable to Nichols, the material facts are as follows.

*Background*

Nichols, a 55 year old African–American, became employed by defendant as a secondary education teacher in the area of language arts in August 1973. So far as the summary judgment record shows, for more than 20 years Nichols enjoyed an enviable career as a successful public school teacher. Apparently, the troubles which ultimately gave rise in 2000 to Nichols's retirement (on disability) and her institution of this lawsuit began around the time Nichols began working at Fallston Middle School in 1996.

Nichols suffers from anxiety disorder (characterized by, *inter alia,* panic attacks, high stress, and physiological changes), which was first diagnosed in 1996. *Dep. of Novella N. Nichols* at 25 (hereinafter *Nichols Dep.*). Evidently, Nichols suffered one or more major life traumas in the mid–1990s that have permanently altered her emotional and psychological balance, but as discussed below, she repeatedly declined (understandably, perhaps) to disclose any of the details of those events to her superiors or to permit her superiors to discuss her ailments with her physicians.

In part as a consequence of her psychiatric symptoms, Nichols began to accumulate a documented history of repeated use of sick leave. In June 1996, Nichols was requested to submit documentation from her doctors to verify her use of such leave. *Def.'s Ex.* 3 (Letter to Kathy Owens Wyatt, MSTA UniServ Director, from F. Thomas Pomilla, Principal of Fallston Middle School, dated July 2, 1996). Nichols was often requested to submit doctor's notes to verify her absences. *Nichols Dep.* at 16; *Dep. of Marilyn Owen* at 24 (hereinafter *Owen Dep.*). One of the recurring themes running through the record is Nichols's displeasure with defen-

dant's insistence that she document the need for her medical absences.

*Field Trips and Memorial Day Absences*

In the fall of 1996, Nichols submitted a doctor's note in which her doctor requested that she be excused from "extracurricular activities, i.e., field trips" because the stress and anxiety produced by such events would be detrimental to her health. *Def's Ex.* 5 (Letter from Joshua R. Mitchell, III, M.D., dated September 13, 1996). Upon receipt of Dr. Mitchell's letter, Fallston Middle School Principal Marilyn Owen sent Nichols a letter informing her that she had received Dr. Mitchell's note but could not accede to her request to be excused from field trips for the following reasons: (1) such duty is a part of Nichols's responsibility as a teacher; and (2) the letter not did not state a sufficient basis to relieve Nichols of that duty. *Def.'s Ex.* 6 (Letter from Marilyn Owen, Principal, dated September 26, 1996). A few weeks later, Owen received another note from Dr. Mitchell elaborating on the need "to accommodate" Nichols with regard to field trips. *Def.'s Ex.* 7; *Pl.'s Ex.* 5 (Letter from Dr. Mitchell, dated October 7, 1996). According to this letter, Nichols suffers from hypertension, varicose veins, and other related conditions, and attending field trips and extracurricular activities exacerbates these conditions, as a result of the heightened stress of such situations. *Id.*

Subsequently, a meeting was held among Nichols, her union representative, Kathy Wyatt, and Dr. Kathleen Eng, assistant superintendent for human resources, at which Dr. Eng agreed to Nichols's request to be excused from field trips. It was decided that another teacher would substitute for Nichols on the field trip, and that Nichols would cover that teacher's classes. *Owen Dep.* at 21–22; *Dep. of Kathleen Eng* at 31 (hereinafter *Eng Dep.*); *Def.'s Ex.* 8 (Letter from Dr. Eng, dated January 23, 1997).

At the time the decision to permit Nichols to be absent from field trips was made, it was also decided that her request to be excused from field trips would be reviewed at the end of the school year, when Nichols was to submit further documentation. *Eng Dep.* at 19–20; *Def.'s Ex.* 8. At the end of the 1996–1997 school year, Nichols submitted documentation from her mental health counselor, social worker Ray Armillei, addressing the need for her to continue to be excused from field trips to accommodate her emotional distress and anxiety. *Pl's Ex.* 7. Dr. Eng reviewed the documentation from Armillei and determined that the documentation was not sufficient as it was from a licensed social worker, not a medical doctor. Nichols was asked to submit further documentation to corroborate Armillei's report. *Eng Dep.* at 36–37. Although Nichols did not submit further documentation, the school administration continued to "accommodate" Nichols with regard to field trips (by permitting her not to go on field trips) for the 1997–1998 school year. *Owen Dep.* at 86–87.

There was one instance in 1997 where no prior arrangements had been made to have a replacement teacher take Nichols's class on a scheduled field trip. *Nichols Dep.* at 40. Ultimately, however, another teacher did take Nichols's class on the field trip. Nichols testified that during the time it took to find a replacement teacher, Nichols felt stressed and embarrassed, particularly as her students sat in her classroom waiting to leave for the trip. *Id.* at 40–41.

Apparently, Nichols's anxiety and depression are particularly acute during the Memorial Day holiday. *Pl's Ex.* 7 (Letter from Ray Armillei, dated July 22, 1997). On May 28, 1997, Principal Owen wrote a letter to Nichols stating that Nichols had

to provide a more specific reason for an absence during the week of May 19, 1997, as the doctor's note only stated that Nichols was "under his care," and as Nichols had a history of being absent the week before Memorial Day. *Pl.'s Ex.* 10 (Letter from Principal Owen, dated May 28, 1997). Nichols provided Principal Owen with the report of Armillei, which stated that Nichols "generally experiences impairment in functioning and emotional upset during the holidays, especially Memorial Day .... In the past, this problem necessitated time away from her duties as she reestablished stability." *Pl.'s Ex.* 7. Owen testified that to her knowledge there was no formal request by Nichols for an "accommodation" in respect to any need for absences surrounding Memorial Day until February 2000. *Owen Dep.* at 22–23.[2]

At the beginning of the 1998–1999 school year, Dr. Eng received another report, unsigned, from Armillei, explaining that Nichols suffered from generalized anxiety disorder with specific phobia. *Def.'s Ex.* 11 (Report from Ray Armillei, dated September 12, 1998). The report also states that this diagnosis is supported by Nichols's psychiatrist, Dr. Peter Williams, who had medicated her since June 1997. The report recommends that Nichols not have to participate in "anxiety provoking events which are additional duties, secondary to her primary function as a 6th grade teacher." *Id.* Thus, the school administration continued to excuse Nichols from attending field trips with her classes. *Eng Dep.* at 40.

On or about May 12, 1999, Nichols sent a letter to Superintendent Jacqueline Haas which discussed some of the circumstances surrounding her medical condition; Nichols apparently enclosed the reports from her counselor that were previously submitted to the school. On or about June 3, 1999, Haas met with Nichols and her husband to discuss Nichols's situation. Following the meeting, Haas wrote to Nichols. *Def.'s Ex.* 12 (Letter from Jacqueline Haas, dated August 26, 1999). Hass informed Nichols that Hass had "questions that have not been addressed in enough detail" for Hass "to make specific determinations regarding [Nichols's] medical status and, thus, [Nichols's] request [for accommodations]." *Id.* Haas explained what further documentation was needed, emphasized her desire to be able to speak to Nichols's treating psychiatrist, and instructed Nichols that once this documentation was received and assessed, specific accommodations could be implemented. *Id.* Even though further documentation was not provided (though Haas did speak with Armillei on the phone), the school continued to accommodate Nichols with regard to field trips for the 1999–2000 school year. *Haas Dep.* at 24, 44; *Eng Dep.* at 40. In fact, it is clear from the record that starting from Nichols's initial request for an accommodation with regard to field trips at the beginning of the 1996–1997 school year, at no time thereafter did Nichols attend a field trip. *Nichols Dep.* at 41.

*The Dispute Over Bereavement Leave*

On August 24, 1999, immediately prior to the start of the 1999–2000 school year, Nichols requested bereavement leave upon

---

2. As mentioned in text, it appears from the record that Nichols was adamant about confidentiality in respect to her ailments and their etiology. *See, e.g., Owen Dep.* at 22–24. It also appears that, in general, Nichols was willing to make greater (though still limited) disclosures to high-level management officials than she made to her immediate supervisor, Principal Owen. In this regard, it appears that she insisted that high-level management withhold disclosures she made to them from Owen, and that officials in the office of the superintendent complied with her requests.

the death of her sibling. *Nichols Dep.* at 12–13. School began for the teachers on August 26, 1999. *Id.; Def.'s Ex.* 15 (Letter from William M. Ekey, Director of Secondary Education, dated October 18, 1999). Under the terms of the Negotiated Agreement between the Board and the Harford County Education Association, Nichols was entitled to six calendar days of bereavement leave. *Def.'s Ex.* 14 (Negotiated Agreement); *see also Nichols Dep.* at 12–13. Defendant counted August 25, 1999 (the day before school started for teachers), as the first day of bereavement leave because the longstanding policy was to commence bereavement leave on the day after it was requested, and calculated the last day of bereavement leave to be August 30, 1999, expecting Nichols's return on August 31, 1999. *Nichols Dep.* at 12–13; *Def's Ex.* 15. However, Nichols did not return to school until September 1, 1999, taking one extra day of leave. *Def.'s Ex.* 15. Consequently, defendant required Nichols to charge her absence on August 31, 1999, to personal leave. *Nichols Dep.* at 13; *Def.'s Ex.* 15.

On September 24, 1999, Nichols filed a formal grievance with the Board over the issue; Haas denied her grievance based upon her interpretation of the Negotiated Agreement. *Def.'s Ex.* 16 (Grievance Form, dated September 24, 1999); *Def.'s Ex.* 15; *Def.'s Ex.* 17 (Letter from Haas, dated November 3, 1999). Following Nichols's request to submit the grievance to arbitration, the Board entered into a Settlement Agreement in which it was agreed that the extra day would be coded as bereavement leave. *Def.'s* 18 (Settlement Agreement, April 11, 2000).

### The Disputes Over the use of a Shadow Teacher

On or about November 1, 1999, as a result of her anxiety disorder, Nichols began an extended period of leave. *Owen Dep.* at 31. Thereafter, on or about November 5, 1999, and again on November 12, 1999, the school received notes from Nichols's doctor indicating her inability to work, citing "a life threatening medical condition," and suggesting an anticipated return date of January 3, 2000. *Def.'s Ex.* 19 (Letter from Dr. Donn Teubner–Rhodes, dated November 5, 1999); *Def.'s Ex.* 20 (Letter from Dr. Donn Teubner–Rhodes, dated November 12, 1999). Following the receipt of these notes, Owen sent Nichols a letter confirming her return date of January 3, 2000. *Def.'s Ex.* 21 (Letter from Owen, dated December 14, 1999).

During Nichols's extended leave, the school, unable to find a long-term substitute to cover the entire period of leave, employed several different substitutes to teach Nichols's class. *Owen Dep.* at 38–39. As a result of the school's inability to find a long-term substitute to cover Nichols's classes, Owen received complaints from parents that the students' instructional program was inconsistent and that the students' progress was threatened as a result of different substitutes. *Id.; see also Def.'s Ex.* 22 (Letter from Leslie Strasdauskas, parent, dated November 22, 1999). Haas determined that the circumstances required a firm proactive response; it was decided that it would be in the best interest of the students and the school to hire a certified teacher as a long-term substitute who could assist Nichols in the instruction of the students and become familiar with the instructional program so that she could step in and teach the class if Nichols needed to take further leave. *Haas Dep.* at 35–36; *see also Eng Dep.* at 60; *Owen Dep.* at 36–37, 38. Thus, prior to Nichols's return, Elizabeth MacFarlane, who is white, was hired as a long-term substitute teacher to work with Nichols through the end of the 1999–2000 school

year. *Owen Dep.* at 38–40; *Def.'s Ex.* 23 (Long–Term Substitute Authorization, December 22, 1999). As explained below, this decision proved to be highly controversial.[3]

On December 29, 1999, Dr. Eng sent a letter to Nichols confirming her return date of January 3, 2000, and informing her that a long-term substitute had been hired, that it was the school's intention to have the substitute work with her throughout the remainder of the school year, and that she would meet with MacFarlane upon her return. *Def.'s Ex.* 24 (Letter from Kathleen Eng, dated December 29, 1999). Upon her return, Nichols, accompanied by her union representative, Patricia Kohler, had a meeting with Principal Owen and Dr. Eng, at which the use of the long-term substitute assigned to Nichols's class was discussed. *Def.'s Ex.* 25 (Letter from Patricia Kohler, dated January 10, 2000). In a letter from Kohler to Owen confirming her understanding of the meeting, Kohler acknowledged that the decision to hire the substitute "was based on [the school's] concerns about the difficulty of acquiring substitutes during Ms. Nichols' [sic] absence and the instructional effect on the students." *Id.* Kohler also acknowledged that the purpose of the substitute was "to acquaint [her] with the Language Arts instruction should there be a need for her assistance" and "to provide a seamless transition if Ms. Nichols would need to take additional sick leave." *Id.*

Principal Owen had hoped to have MacFarlane present in each of Nichols's classes; however, it was agreed that she would only be present in three of her five classes. *Id.; Owen Dep.* at 53–54. In addition, while Principal Owen had expected that MacFarlane would cooperatively assist Nichols in the instruction of the students, Nichols told Principal Owen that she did not want MacFarlane's assistance and that she would only allow MacFarlane to sit and to observe. *Owen Dep.* at 41–47. Accordingly, MacFarlane was instructed to observe Nichols's classes and be ready to take over if needed, while Nichols was instructed to keep MacFarlane informed of the instructional program. *Id.* at 46–47.

### The Principal's Reprimand

On January 14, 2000, Principal Owen sent Nichols a letter reminding her of the need to cooperate with MacFarlane, to inform her of any changes in the location of her classes, and to supply her with any handouts given to students so that MacFarlane would be ready to assume responsibility for planning and teaching the class in the event of Nichols's absence. *Def.'s Ex.* 26 (Letter from Owen, dated January 14, 2000); *Owen Dep.* at 47–48. As a result of Nichols's failure to follow the directives outlined in Principal Owen's letter (and repeated to her during a subsequent meeting on January 18, 2000), Principal Owen issued to Nichols a formal reprimand on February 8, 2000. *Def.'s Ex.* 27 (Letter from Owen, dated February 8, 2000); *Owen Dep.* at 55, 61–62. Meanwhile, on or about January 15, 2000, Nichols sent Superintendent Haas a copy of a report from her counselor, Armillei, in which he explained that her anxiety had worsened since returning to work as a result of the measures taken to insure that Nichols's classes would remain covered. Armillei stated that the "arrangement" regarding MacFarlane's involvement in

---

**3.** An overarching theme of Nichols's theory of this case is that Principal Owen arranged to hire MacFarlane with the specific aim of forcing Nichols to retire, and replacing her with MacFarlane as a permanent full-time employee. Apart from counsel's speculative arguments cobbled together from pieces of the record, there is no substantial evidence to support this theory.

Nichols's daily classes needed to be modified. *Def.'s Ex.* 28 (Report by Armillei, January 15, 2000).

On February 8, 2000, Nichols sent Superintendent Haas a letter notifying Haas that she felt Principal Owen's formal reprimand constituted race, age, and disability discrimination. *Def.'s Ex.* 29 (Letter from Nichols, dated February 8, 2000). Specifically, Nichols contended that the directives discussed in Principal Owen's January 14, 2000, letter were not required of any other similarly situated teacher, and that the school had failed to remove MacFarlane from her class as requested by Armillei. *Id.* Nichols requested that the letter of reprimand be rescinded and that MacFarlane be promptly removed from her classroom. *Id.*

### A Formal Accommodation Plan is Adopted by the Parties

On February 25, 2000, Nichols, accompanied by her attorney, Lisa Hatfield, Esq., and Armillei, had a meeting with Dr. Eng, Deputy Superintendent Robert Williams, and Principal Owen, at which her need for accommodation was discussed. *Def.'s Ex.* 30 (Memorandum from Dr. Eng, dated March 2, 2000). As a result of the meeting, an Accommodation Plan was formulated to address Nichols's anxiety disorder and to define certain accommodations that would be made to provide a productive work environment for her. *Def.'s Ex.* 31 (Accommodation Plan). Among other understandings, goals, and aspirations, the Accommodation Plan provided as follows: (1) Nichols would not be required to accompany students on field trips or to assemblies held at the nearby Fallston High School Auditorium; (2) MacFarlane would not be physically present in Nichols's classroom; (3) Nichols would be required to leave a copy of her daily lesson plans for the next day and any student handouts in MacFarlane's mailbox each evening; and,

it was thought, (4) "with reduced stress," Nichols would be able to work during the week of Memorial Day. *Id.*

On March 7, 2000, the school received a note from Dr. Teubner–Rhodes in which he informed the school that Nichols suffered from idiopathic articario and angiodema, hypertension, and depression, and that the requirement to submit daily lesson plans to MacFarlane was making her conditions worse. *Def.'s Ex.* 32 (Letter from Donn Teubner–Rhodes, M.D., dated March 7, 2000). Robert Williams, Acting Deputy Superintendent, responded to Dr. Teubner–Rhodes's note by explaining that the requirement to have Nichols submit lesson plans was necessary for MacFarlane to have appropriate plans should Nichols be absent. *Def.'s Ex.* 33 (Letter from Robert C. Williams, dated March 9, 2000). Nonetheless, the school agreed to modify the Accommodation Plan to permit Nichols to deposit her daily lesson plans in Owen's mailbox rather than in MacFarlane's mailbox, and also agreed to revisit the need for this procedure in 60 days. *Def.'s Ex.* 34 (Memorandum from Eng, dated March 9, 2000). Nichols was given a copy of the modified plan on March 16, 2000. *Def.'s Ex.* 35 (Letter from Owen, dated March 24, 2000).

On March 22, 2000, Nichols's attorney sent a letter to Dr. Eng requesting that the requirement to submit lesson plans be withdrawn altogether and that the letter of reprimand be rescinded. *Def.'s Ex.* 36 (Letter from Lisa Hatfield, Esq., dated March 22, 2000). Dr. Eng responded to Nichols's attorney's letter. She informed her that although Nichols had previously agreed to submit lesson plans so that consistency could be maintained in her classroom, Nichols would no longer be required to do so. Moreover, Dr. Eng informed the attorney that the letter of reprimand was issued when Nichols was given directives

by her principal and failed to follow them. Nonetheless, Dr. Eng explained that the letter would be removed from her official file maintained in the Human Resources Office, but would remain in the personnel file kept at the school by the Principal, available for reference in the future. *Id.*

### Nichols Demands Further Changes

Thereafter, Nichols wrote to Dr. Eng, again insisting that she not be required to provide MacFarlane with daily lesson plans. *Def.'s Ex.* 38 (Letter from Nichols, dated April 17, 2000). In addition, Nichols complained that the directives required of her were discriminatory and that the letter of reprimand should be removed from all of her files. *Id.* Dr. Eng responded to Nichols by explaining to her that the letter of reprimand was the result of her failing to follow directions given by her Principal, and that it was not discriminatory. *Def.'s Ex.* 39 (Letter from Dr. Eng, dated May 2, 2000). Dr. Eng reiterated that the letter would remain in the file kept by her principal. *Id.*

Soon thereafter, Nichols sent Dr. Eng another letter in which she reiterated that it would not be in her best interest to provide lesson plans, and again requested that the letter of reprimand be removed from her files. *Def.'s Ex.* 40 (Letter from Novella Nichols, dated May 12, 2000). Dr. Eng responded to Nichols by first reminding her that the requirement that she provide lesson plans for MacFarlane had been rescinded and that, nevertheless, MacFarlane may need to work in areas of the school which overlapped with Nichols's working locations to fulfill her assigned duties and that therefore Nichols should expect to encounter MacFarlane. *Def.'s Ex.* 41 (Letter from Dr. Eng, dated May 31, 2000). Dr. Eng also restated her position that the letter of reprimand was not illegal and would thus remain in the principal's file. *Id.*

Nichols again sent Dr. Eng a letter complaining that her expectation that she would have no further contact with MacFarlane had not been satisfied because MacFarlane continued to work in areas of the school common to both teachers. *Def.'s Ex.* 42 (Letter from Nichols, dated June 28, 2000). Nichols again stated that the letter of reprimand was illegal and should be rescinded. *Id.* Additionally, Nichols declined Dr. Eng's invitation to meet to discuss her concerns further. *Id.*

### Nichols Retires on Disability and Files Suit

On September 26, 2000, Nichols submitted her letter of resignation and stated that she intended to retire as of October 1, 2000, because the alleged discriminatory practices of the administration had not been corrected and had caused further deterioration of her health. *Def.'s Ex.* 43 (Letter from Nichols, dated September 26, 2000).

Nichols, acting pro se, filed suit in this court on October 13, 2000, against the defendants named earlier. In consequence of prior rulings on motions filed by defendants, the Board is the only remaining defendant in this case, and the only remaining claims are those brought under Title VII for race discrimination and retaliation and under section 504 of the Rehabilitation Act for disability discrimination. Nichols has been represented by counsel during the discovery phase of the case and counsel has filed a comprehensive opposition to the pending dispositive motion.

### III.

Nichols contends that defendant violated the Rehabilitation Act in that it failed to accommodate her psychiatric disability. That claim fails as a matter of law.

Section 504 of the Rehabilitation Act of 1973 ("the Act") provides that "[n]o other-

wise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a) (Supp.2001); *see also The Estate of Ellen Alcalde v. Deaton Specialty Hosp. Home, Inc.*, 133 F.Supp.2d 702, 707 (D.Md.2001). The Act specifies that "the standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under ... [the ADA]." 29 U.S.C. § 794(d) (1999); *see Myers v. Hose*, 50 F.3d 278, 281 (4th Cir.1995); *Bissell v. Reno*, 74 F.Supp.2d 521, 527 (D.Md.1999). Under the ADA, a qualified individual with a disability is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see Bissell*, 74 F.Supp.2d at 527.

■ To establish a violation of section 504, a plaintiff must prove: (1) she is disabled; (2) the defendant knew of her disability; (3) with the accommodation, the plaintiff could perform the essential functions of her job; and (4) the employer refused to make such accommodations. *Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir.1995) (citing *Gates v. Rowland*, 39 F.3d 1439, 1445 (9th Cir.1994)); *see Deaton Specialty Hosp. Home, Inc.*, 133 F.Supp.2d at 707 (citing *Proctor v. Prince George's Hosp. Ctr.*, 32 F.Supp.2d 820, 826 (D.Md.1998)). Defendant assumes that Nichols satisfies the first two requirements. It argues that Nichols would be unable to perform the essential functions of her job with accommodation and that, in any event, defendant

did make such accommodations. I am persuaded that, as a matter of law, Nichols is unable to establish a violation of section 504 as it is evident that defendant adequately accommodated Nichols.

*Field Trip Accommodation*

■ Defendant argues that no reasonable jury could find that defendant failed to provide Nichols's requested accommodation of not attending field trips. Defendant clearly accommodated Nichols's request to be excused from field trips. Nichols's first request for an accommodation was her request to be excused from taking students on field trips. At the beginning of the 1996–1997 school year, Nichols submitted two notes from her doctor in which he requested that Nichols be excused from field trips because of the stress and anxiety that they produced. *Def.'s Exs.* 6, 7. Nichols concedes that shortly after this request was made, Dr. Eng agreed to excuse her from field trips. *Nichols Dep.* at 37. The school consented to arrange for another teacher to take her students on field trips while Nichols would cover that teacher's classes. From that point on, Nichols admitted in her deposition that she never attended another field trip. *Id.* at 41. Both Dr. Eng and Principal Owen testified that Nichols was accommodated with regard to field trips every year that she was employed. *Eng Dep.* at 36; *Owen Dep.* at 20.

■ Nichols's failure-to-accommodate claim seems to rest on her contention that, even apart from the actual accommodation that was afforded, defendant can be found liable because it failed to enter into the interactive process required by law, citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir.2000) (en banc), *cert. granted in part on other grounds*, 532 U.S. 970, 121 S.Ct. 1600, 149 L.Ed.2d 467 (2001).

In *Barnett*, the plaintiff, Barnett, injured his back. *Barnett*, 228 F.3d at 1108. After returning from disability leave, he transferred out of his job of handling freight and to a position in the mail room. *Id.* Barnett's doctor had determined that he could safely perform duties in the mail room. *Id.* Barnett, nervous that he would be transferred out of the mail room to the cargo area, wrote to his station manager requesting that he be permitted to stay in the mail room as a reasonable accommodation under the ADA. *Id.* at 1109. The employer did not respond to Barnett for five months but allowed him to remain in the mail room during its evaluation of his claim. *Id.* He was then informed that he would be placed on job injury leave. *Id.*

The Ninth Circuit, presented with the question of whether defendant employer discriminated against plaintiff by denying him accommodation by failing to engage in the interactive process, explained that the legislative history of the ADA is clear "that employers are required to engage in an interactive process with employees . . . to identify and implement appropriate reasonable accommodations." *Barnett*, 228 F.3d at 1108, 1111. The court held, in part, relying on the EEOC regulations, in particular 29 C.F.R. § 1630.2(*o*)(3), the *EEOC Compliance Manual* (March 1, 1999), and the determinations of other circuit courts, that "the interactive process is mandatory rather than a permissive obligation on the part of employers under the ADA and that this obligation is triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation." *Barnett*, 228 F.3d at 1111–14. The Ninth Circuit described the interactive process as follows:

> The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees. The

shared goal is to identify an accommodation that allows the employee to perform the job effectively. Both sides must communicate directly, exchange essential information and neither side can delay or obstruct the process. . . .

*Id.* at 1114–15 (footnote omitted) (citations omitted).

Nichols cites Principal Owen's initial denial of Nichols's request that she not be required to attend field trips as evidence of a violation. However, while Owen did initially deny Nichols's request to be excused from going on field trips, her decision also served as defendant's first step in the interactive process. This is true because Principal Owen informed Nichols that going on field trips was an essential function of her job and that the documentation from her doctor did not provide a sufficiently *clear* basis for relieving her of her duty. *Cf. Barnett*, 228 F.3d at 1115 ("The interactive process requires that employers analyze job functions to establish the essential and nonessential job tasks. In order to identify the barriers to job performance, employers must consult and cooperate with disabled employees so that both parties discover the *precise* limitations and the types of accommodations which would be most effective." (emphasis added)).

Moreover, after Principal Owen received further documentation from Nichols's doctor and forwarded it to Dr. Eng, defendant further engaged in the interactive accommodation process by meeting with Nichols and her union representative, Kathy Wyatt. At that meeting, Dr. Eng agreed to grant Nichols's request to be excused from field trips. *Def.'s Ex.* 8. Accordingly, as a matter of law, defendant engaged in this process each year as defendant reviewed Nichols's request to be excused from field trips to determine whether the

accommodation was still needed. *Eng Dep.* at 31–33.

▮ Nichols also notes that during the 1996–1997 school year she was asked to attend almost every field trip that was scheduled, and on one occasion, discussed *supra,* no alternative plans were made in advance on Nichols's behalf for a substitute to attend the field trip. Defendant concedes that for this particular field trip no accommodation had been set in place in advance. *Def.'s Mem. of Law in Supp. of its Mot. for Partial Dismissal and for Summ. J.* at 23. It seems clear that it had been the school's understanding that it was Nichols's responsibility to inform the school when her class was going on a field trip so that the necessary accommodation could be made in advance. There is substantial evidence that, for this field trip, it was not clear whether Nichols had informed the school that her class would be attending. *Eng Dep.* at 72. In any event, once it was discovered that Nichols would need the accommodation for that day, a teacher was found to go in her place, and Nichols did not have to attend the field trip. *Id.; Nichols Dep.* at 40. At most, this incident was the result of miscommunication between the school and Nichols, and was in no way a deliberate refusal to accommodate her. This incident is not independently cognizable as a violation of the Rehabilitation Act.

▮ Nichols further argues that liability might be imposed for defendant's failure to engage in the interactive process because: (1) Principal Owen did not understand Nichols's request to be excused from attending field trips as an accommodation; (2) the school continued to require each year that Nichols provide medical docu-

mentation supporting her need not to attend the field trips; and (3) the school did not accept the letters from her therapist as medical documentation. These contentions are unavailing. The facts of this case are quite different from the facts in *Barnett,* where no accommodation was made except for the five months that U.S. Air permitted Barnett to remain in the mail room while it evaluated his claim.[4] In this case, even assuming that the three items mentioned above do indeed constitute impermissible gaps in the interactive process (a dubious proposition), it is still the case that actual accommodations to relieve Nichols of the requirement that she go on field trips were made each year.

Shortly after she requested to be accommodated for field trips, Dr. Eng agreed to excuse her from field trips. To accommodate Nichols, the school agreed to arrange for another teacher to take her students on a field trip while Nichols would cover that teacher's classes. From that point on, Nichols admitted in her deposition, she never attended another field trip. Both Dr. Eng and Principal Owen testified that Nichols was accommodated with regard to field trips every year that she was employed. Accordingly, there is simply no basis to impose liability on defendant. *See Walter v. United Airlines, Inc.,* 2000 WL 1587489, at *5, 232 F.3d 892 (4th Cir.2000)(stating that because the employer reasonably accommodated the employee's disability, the employer's alleged failure to engage in the interactive process is of "no consequence"); *Scott v. Montgomery County Gov't,* 164 F.Supp.2d 502, 508 (D.Md.2001)(quoting *Walter v. United Airlines, supra,* for the same proposition).

---

4. The same is true with regard to the unpublished decision, *Leicht v. Hawaiian Airlines, Inc.,* 2001 WL 884708, 15 Fed.Appx. 552 (9th Cir.2001), relied on by Nichols; the plaintiff was never provided with her requested accommodation. Thus, *Leicht* is inapplicable to the present case.

This conclusion makes good sense legally and pragmatically. The Ninth Circuit in *Barnett* clearly stated that liability attaches when the employer rejects the "core process" when reasonable accommodation would have been possible, *Barnett*, 228 F.3d at 1116, and that "summary judgment is available only where there is no genuine dispute that the employer has engaged in the interactive process in good faith." *Id.* Acting in good faith involves both sides communicating directly exchanging essential information "and neither side can delay or obstruct the process." *Id.* at 1115. As explained at length *supra*, defendant here did not undermine the "core process;" rather, it promptly provided Nichols with her requested accommodation. Further, the record does not demonstrate that defendant at any time delayed and obstructed the process in bad faith. Accordingly, defendant is entitled to judgment as a matter of law on this claim.

### *Memorial Day Accommodation*

■ Nichols also argues that defendant failed to enter into the interactive process with regard to her request for accommodation for the period surrounding annual Memorial Day observances. Nichols testified that one of the accommodations she requested was that there be an understanding that she may need to take time off around Memorial Day because she experiences increased depression around that time. *Nichols Dep.* at 10–11, 44. Defendant claims that before this testimony, it was unaware that there was really an accommodation that had to be made with regard to this request; rather, defendant simply had an understanding that she may need to take time off around Memorial

Day. In fact, it was stated (at least as an aspiration) in the Accommodation Plan that if the other accommodations were provided, then Nichols would be able to work around the time of Memorial Day. *Owen Dep.* at 67–68, 73; *Def.'s Ex.* 31.

In any event, the record does not demonstrate that defendant refused to provide Nichols an accommodation in this respect or that it otherwise disciplined her for taking time off around Memorial Day. Nichols claims that defendant penalized her because Principal Owen, on one occasion in 1997, requested that she submit documentation to verify her time off around this time. *See Pl.'s Ex.* 10 (Letter from Owen, dated May 28, 1997). However, Principal Owen was not *penalizing* Nichols, but was simply following an arrangement that the previous principal had with Nichols, which was made with input from Nichols's union representative after Nichols's attendance had become a concern. Specifically, it had been agreed that she would submit doctor's notes for every absence. *Owen Dep.* at 24. Nichols does not cite to any instance besides that in 1997. Accordingly, it is clear that Nichols was accommodated in respect to her need for time off surrounding the Memorial Day observance and there is no basis for liability.[5]

In sum, plaintiff has failed to project any substantial evidence in support of her claim that defendant failed to grant any of her requests for accommodation. It is unnecessary, therefore, to discuss defendant's argument that, even with an accommodation, Nichols could not perform the essential functions of her job as a middle school teacher. Thus, summary judgment

---

**5.** Nichols has not opposed defendant's argument that Nichols's request to have MacFarlane removed from her class was not a request for a "reasonable accommodation," or that, in any event, defendant acceded to this request. Nichols has also not opposed defendant's contention that it "accommodated" Nichols's request to discontinue submission of lesson plans.

shall be granted in defendant's favor as to the disability claim under section 504.

## IV.

Nichols's race discrimination and retaliation claims under Title VII, including her claim of constructive discharge, are similarly legally insufficient.

### Discrimination Based on Race under Title VII

■■■ "A plaintiff may prove the discriminatory intent of the defendant through direct evidence, by introducing statements of the defendant." *Moore v. City of Charlotte,* 754 F.2d 1100, 1105 (4th Cir.) (citing *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). In the absence of direct evidence of a discriminatory motive, claims involving disparate treatment involving a distinct "employment injury" are analyzed for summary judgment purposes under the familiar *McDonnell Douglas* scheme common to discrimination claims. *Id.; Chika v. Planning Research Corp.,* 179 F.Supp.2d 575, 580 (D.Md.2002) (citing *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 278 (4th Cir.), *cert. denied,* 531 U.S. 875, 121 S.Ct. 181, 148 L.Ed.2d 125, *reh'g denied,* 531 U.S. 1031, 121 S.Ct. 613, 148 L.Ed.2d 524 (2000)). Under this scheme, the plaintiff must first demonstrate a prima facie case of discrimination.

"In general terms, a plaintiff establishes a prima facie case by proving a set of facts which would enable the fact-finder to conclude in the absence of any further explanation, that it is more likely than not that the adverse employment action was the product of discrimination." *Ennis v. National Ass'n of Business and Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir.1995) (citations omitted). "To assist in the practical appli-cation of the standard, we have on occasion specified more precisely the elements of the prima facie case, depending on the factual situation and the claim alleged." *Id.* (citing *McDonnell Douglas Corp.,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817). Specifically, to make out a prima facie case of discrimination based on race, the plaintiff must produce evidence to show:

1. She is a member of a protected class;

2. She was performing her duties in a satisfactory manner;

3. She was subjected to an adverse employment action; and

4. She was treated differently than similarly situated individuals outside of her protected class.

*See Chika,* 179 F.Supp.2d at 581 (citing *Ennis,* 53 F.3d at 58); *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817 (stating that the fourth element requires demonstrating that similarly situated employees received more favorable treatment). This initial showing requires the plaintiff to produce "a set of facts which would enable the fact-finder to conclude with reasonable probability that *in the absence of any further explanation,* the adverse employment action was the product of [race or sex] discrimination." *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1315 (4th Cir.1993) (alteration in original).

Once the plaintiff establishes a prima facie case, a presumption of discrimination arises and the burden of production is placed on the employer to articulate a legitimate nondiscriminatory reason for the adverse employment decision. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Because the employer's burden is one of production and

not of persuasion, it "is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *E.E.O.C v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992) (internal quotation marks omitted) (quoting *E.E.O.C. v. Western Electric Co., Inc.*, 713 F.2d 1011, 1014 (4th Cir.1983)). If the employer meets this burden, the presumption of discrimination is eliminated, and the plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the employer's nondiscriminatory reasons are pretextual and that the adverse employment action was actually taken because of the employee's race or sex. *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742.

The Supreme Court clarified the plaintiff's burden at the pretext stage in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *Chika*, 179 F.Supp.2d at 581. The Court reiterated that evidence of pretext, combined with the plaintiff's prima facie case, does not compel judgment for the plaintiff, because "it is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (quoting *Hicks*, 509 U.S. at 519, 113 S.Ct. 2742). However, *Reeves* made plain that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.*

Nichols alleges that defendant discriminated against her on the basis of race by treating her differently than other similarly situated teachers in five respects: (1) disputing her bereavement leave; (2) requiring her to submit doctor's notes when she would be absent; (3) placing a shadow teacher in her classroom; (4) requiring her to submit daily lesson plans; and (5) issuing a letter of reprimand.

Defendant assumes that Nichols satisfies the first two elements of the prima facie case; she is a member of a protected class and is qualified for her job. Defendant contends, nonetheless, that as a matter of law, (1) none of the five actions identified as "adverse employment actions" amounts to an adverse employment action and, in any event, (2) the facts do not show that Nichols was treated differently than any similarly situated teacher outside of her protected class. Thus, defendant contends, Nichols lacks evidence necessary to establish two elements of her prima facie case.

■ Defendant argues specifically that none of the five cited alleged discriminatory acts constitutes an adverse employment action for the purposes of satisfying the third element of the prima facie case. In response to defendant's argument, Nichols disputes defendant's arguments as to only one of the five alleged acts of discrimination—the written reprimand. *Pl.'s Mem. of Law in Supp. of Pl.'s Opp. to Def.'s Mot. for Partial Dismissal and for Summ. J.* at 28 (hereinafter *Nichols Opp.*). Accordingly, I conclude that Nichols has conceded that none of the other four cited acts of alleged discrimination amounts to an adverse employment action. Thus, I address only the issue of whether the letter of reprimand constitutes an adverse employment action.[6]

---

6. Even if I were to regard the other acts complained of as adverse employment actions, the outcome would be the same because, as discussed *infra* in text, Nichols has failed to identify any similarly-situated teachers who were not African–American who were afforded less onerous treatment.

The Fourth Circuit explained in *Von Gunten v. State of Maryland*, 243 F.3d 858 (4th Cir.2001), that "[a]dverse employment action includes any retaliatory act or harassment if, but only if, that act or harassment results in an adverse effect on the 'terms, conditions, or benefits' of employment." [7] *Id.* at 866 (quoting *Munday v. Waste Mgmt. of North America, Inc.*, 126 F.3d 239, 243 (4th Cir.1997)). In *Von Gunten*, the Court determined that hyperscrutinizing sick leave, requiring doctor's notes, following an employee around and questioning her activities, and downgrading a performance evaluation do not amount to adverse employment actions. *Id.* at 867–70; *see also Nye v. Roberts*, 159 F.Supp.2d 207, 213 (D.Md.2001)("[r]eprimands do not automatically affect the terms and conditions of employment.")(citing *Nelson v. Univ. of Maine Sys.*, 923 F.Supp. 275, 281 (D.Me.1996)).

In *Chika v. Planning Research Corp.*, *supra*, I concluded as a matter of law that two verbal reprimands did not amount to an adverse employment action, *Chika*, 179 F.Supp.2d at 587, noting as follows:

> Chika fails to project any evidence concerning the effect of the two verbal reprimands. Chika does not state that either reprimand could lead to his demotion or termination. Nor does Chika establish that the two verbal reprimands had any impact on his job performance or whether the reprimands were documented in his personnel file. From all that appears, the reprimands do not appear to qualify as "adverse employment actions" within the contemplation of Title VII.

*Id.*

■ The same cannot be said in view of the facts in this case. Although a reprimand, as noted *supra*, is not *by definition* an adverse employment action simply because it may be considered a "punitive measure," *cf. Keenan v. American Cast Iron Pipe Co.*, 707 F.2d 1274, 1277 (11th Cir.1983)(explaining that "[t]he term reprimand itself connotes punishment" but a reprimand does not necessarily arise to a "tangible job detriment"), the reprimand from Principal Owen in the present case states:

> It has come to my attention that you are not following the directives I outlined in a letter to you dated January 14, 2000, and repeated in a meeting with you on Tuesday, January 18, 2000, at 7:45 a.m. A copy of the letter is enclosed.

> Consider this letter a formal reprimand for your failure to comply with the mandates concerning the scheduling of your classes and supplying Ms. MacFarlane with handouts. Further failure to specifically follow my directives will be considered gross insubordination and will be subject to further disciplinary action including suspension without pay and/or dismissal.

*Pl.'s Ex.* 18 (Letter from Principal Owen, dated February 8, 2000). Unlike the circumstances in *Chika*, it is clear that this reprimand could be understood to lead potentially to a change in benefits or to termination. Moreover, as recounted *supra*, although the reprimand was removed from her official file with human resources, it remained in her personnel file kept by the principal. On this record, then, I am not willing to conclude as a matter of law that the reprimand in the present case does not amount to an adverse employment action.

---

7. While the court in *Von Gunten* dealt with discrimination in the context of retaliation, the court noted that the same standard for an adverse employment action should be used for both retaliation claims and for disparate treatment discrimination claims. *Von Gunten*, 243 F.3d at 863 n. 1.

■ This conclusion is of scant assistance to Nichols, however. Nichols contends that the "totality of the circumstances" indicate that she was reprimanded in a discriminatorily disparate manner. This argument fails because Nichols is unable to demonstrate that she was treated differently from similarly situated individuals outside her protected class; thus, she cannot establish a prima facie case of discrimination in respect to the reprimand (or any other alleged ground of disparate treatment).

Indeed, as to no ground of alleged discriminatory treatment mentioned by Nichols has she been able to identify any other teacher who is remotely "similarly situated" to herself. The three non-African-American teachers Nichols seeks to use as comparators are manifestly *dis*similarly situated. First, Anne Rees–Pollin took twelve weeks of leave pursuant to the Family and Medical Leave Act ("FMLA") to care for her husband who had suffered a severe injury. Therefore, when she returned, there was no concern for her attendance or possible need for additional leave. *Aff. of Donald Harmon* ¶¶ 2–3 (Assistant Superintendent for Human Resources for the Harford County Public Schools). Second, Josephine Weininger took twelve weeks of FMLA leave to recover from the disabling effects of her diabetes, but there was no concern for her attendance or her need for additional leave when she returned. *Id.* ¶¶ 4–5. Likewise, Maureen Tympanick took twelve weeks of FMLA leave to recover from surgery, but there was again no concern for her attendance or an anticipated need for additional leave when she returned. *Id.* ¶¶ 6–7. Therefore, it is apparent that these teachers were not similarly situated to Nichols in terms of their attendance history and expected need for additional leave upon her return.

As a matter of law, the record here shows that starting in January 2000, the issue of whether Nichols would be able to continue to work for defendant as a classroom teacher was very much a day-to-day proposition. The fact of the matter is, teaching energetic sixth graders is inherently stressful and anxiety-producing for even the most accomplished veteran teacher. Nichols's combination of physiological and psychiatric ailments required the defendant to be ever on guard against the need to provide an ameliorating response to her pattern of unpredictable, and vaguely-explained, even if genuinely necessary, absences. The defendant's legal and, indeed, moral, responsibilities to the children of the school district and their parents required no less under the circumstances. Consequently, defendant is entitled to judgment as a matter of law as to any claim of disparate treatment discrimination.

*Retaliation*

■ Nichols also claims unlawful retaliation in violation of Title VII. To establish a prima facie case of retaliation, a plaintiff must prove that "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Von Gunten v. Maryland,* 243 F.3d 858, 863 (4th Cir.2001) (citing *Beall v. Abbott Labs.,* 130 F.3d 614, 619 (4th Cir.1997)). Once the plaintiff has established a prima facie case, the defendant has the burden of producing evidence of a legitimate nondiscriminatory reason for the adverse action. *Munday v. Waste Mgmt. of N. America, Inc.,* 126 F.3d 239, 242 (4th Cir.1997) (citing *McDonnell Douglas Corp.,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985)), *cert. denied* 522 U.S. 1116,

118 S.Ct. 1053, 140 L.Ed.2d 116 (1998). If the defendant raises a genuine issue of fact, then the plaintiff bears the burden of proving retaliation by demonstrating that the employer's reason is pretextual. *Id.* (citing *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994)); *Obi v. Anne Arundel County,* 142 F.Supp.2d 655, 672 (D.Md.2001), *aff'd,* 2002 WL 246327, 28 Fed.Appx. 333 (4th Cir.2002).

Nichols has not established a prima facie case and does not even attempt to explain how the record supports the view that she can show a prima facie case as required. Rather, Nichols argues the following bewildering contention:

> The timing in this case indisputably shows that [Nichols] was retaliated against due to her complaints of disparate treatment by Defendant. After [Nichols] told Defendant that placing the shadow teacher in her classroom was tantamount to discrimination, [Nichols] received the formal reprimand discussed above. Many courts have held that even if the employment practice being opposed is not a violation of Title VII, an employee's opposition to it is protected if the employees reasonably believes it was a violation. *See Jennings v. Tinley Park Community Consol. School District No. 146,* 864 F.2d 1368 (7th Cir. 1988). Therefore, even assuming, *arguendo,* that Defendant had a legitimate nondiscriminatory reason for placing a shadow teacher in [Nichols's] classroom, [Nichols's] opposition to it and subsequent reprimand still constitutes retaliation in violation of Title VII of the Civil Rights Act.

*Nichols Opp.* at 29.

■ Overlooking the fact that the use of a shadow teacher as reflected in this record is not an adverse employment action and that therefore defendant need not provide a "nondiscriminatory reason" for it, in the first place, it appears from this argument that Nichols is claiming that she was retaliated against after she complained of discrimination. Specifically, Nichols seems to argue that after she simply made the assertion that placing a shadow teacher in her classroom was discriminatory (the alleged "protected activity"), she received a written reprimand (the "adverse employment action"). In so arguing, Nichols has grievously misconstrued the record.

According to the undisputed record, Nichols told Principal Owen that placing a shadow teacher in her class was discriminatory *after* Nichols received the reprimand. *See supra* pp. 10–15. Principal Owen did testify that before issuing the reprimand, Nichols sent Owen a letter, which has not been included in the record, in which Nichols stated that she did not want MacFarlane assisting her in her teaching but would allow her to observe her classes. *See supra* p. 11. Principal Owen agreed to heed Nichols's request. *Id.* Thus, the record positively refutes the argument that Nichols's mere assertion of a discriminatory motive in the assignment of a shadow teacher was protected activity which resulted in an adverse employment action.

■ Even assuming there was protected activity and further that the reprimand amounts to an adverse employment action, Nichols is unable to satisfy the third requirement of a prima facie case of retaliation—the causal connection. "To survive summary judgment ... [Nichols] must have evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action." *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir.1998). "To satisfy the third element, the employer must have taken the adverse employ-

ment action because the plaintiff engaged in a protected activity." *Id.*

While causation depends largely on the particular facts and circumstances of a case, factors pertinent to the causation element may include temporal proximity between the two events, an intervening pattern of retaliatory conduct, inconsistent reasons by the employer for the adverse action, and differential treatment of other employees.

*Jaudon v. Elder Health, Inc.,* 125 F.Supp.2d 153, 165 (2000).

██ In this instance, it is clear beyond doubt as to the cause of the reprimand. As a matter of law, because no reasonable juror could conclude otherwise, any protected activity in which Nichols engaged did not lead to the reprimand. After it came to Principal Owen's attention that Nichols was failing to keep MacFarlane informed of the educational program as directed, Principal Owen sent Nichols a letter reminding her of her need to cooperate with MacFarlane, including informing her of any changes in the location of where her classes were to meet and supplying her with any handouts given to students so that MacFarlane would be ready to assume responsibility for planning and teaching the class in event of her absence. *Def.'s Ex.* 26; *Owen's Dep.* at 47–48. As a result of Nichols's further failure to follow the directives outlined in Owen's letter (and a subsequent meeting), however, Owen issued a formal reprimand. *Def.'s Ex.* 27; *Owen Dep.* at 61–62.

Therefore, the reprimand was plainly the result of Nichols's failure to follow directives, and equally plainly, it was unconnected to any protected activity under Title VII. *Cf. Robinson v. Baltimore City Dept.,* 181 F.Supp.2d 470, 474 (D.Md.2002) (determining that a causal connection could not be found due to an "evidentiary gap"); *Norman v. Rubin,* 1999 WL 739433 at *5, 191 F.3d 448 (4th Cir.1999) (finding

that district court properly determined that there was no causal connection because plaintiff's supervisor refused to upgrade her position before she filed her EEO complaint); *Shabica v. Engineering Sales Assocs. of the Southeast, Inc.,* 1999 WL 17819, at *4, 172 F.3d 864 (4th Cir. 1999) (determining that the causal connection was not established because the plaintiff "simply assert[ed] that she complained about a vulgar remark made by [coworker] and that she was terminated seven months later" and "[t]hose two facts are insufficient to establish, absent additional evidence, that [defendant] fired [plaintiff] 'because' she complained about [coworker's] vulgar statement" (citing *EEOC v. Clay Printing Co.,* 955 F.2d 936, 943 (4th Cir. 1992))). Accordingly, summary judgment shall be granted to defendant on the claim of retaliation.

### Constructive Discharge

██ Nichols also claims that she was constructively discharged in violation of Title VII. Constructive discharge occurs "when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Nye,* 159 F.Supp.2d at 214 (internal quotation marks omitted) (quoting *Holsey v. Armour & Co.,* 743 F.2d 199, 209 (4th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985); citing *Munday,* 126 F.3d at 244). A plaintiff must prove (1) deliberateness of the employer's action and (2) intolerability of working conditions. *Id.* (citing *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986)). "Although ... [the Fourth Circuit] requires proof of the employer's specific intent to force an employee to leave, intent can be inferred from circumstantial evidence." *Id.* (citing *Bristow,* 770 F.2d at 1255).

■ Nichols argues that defendant took deliberate actions to see that Nichols would resign, and she also argues that her doctors concluded that the working conditions were intolerable. *Nichols Opp.* at 29–30. Nichols has presented no evidence indicating that anyone ever asked her to resign or suggested that she leave. Nor is this intent inferable from the actions of the school's administration.

Nichols first argues that both defendant's hiring of MacFarlane to "replace" her and requiring Nichols to keep MacFarlane informed of her educational program were deliberate acts taken by defendant to force Nichols to resign from her job. *Nichols Opp.* at 29–30. This speculative theory is unsupported by any substantial evidence. As explained *supra,* MacFarlane was plainly not hired to replace Nichols. Moreover, the facts demonstrate that the requirements imposed on Nichols to keep MacFarlane informed were simply done to acquaint MacFarlane with the educational program that Nichols was following in her classroom so that MacFarlane could step in if needed. *Further, Nichols agreed to this situation with her union representative when MacFarlane was first hired. See Def.'s Ex.* 25. To be sure, the record shows that considerable tension inhered in the defendant's efforts to accommodate Nichols's myriad requests and to respond to the many letters received from Nichols, her attorney and her health care providers. Nevertheless, there is absolutely no evidence indicating that any of defendant's supervisors intended Nichols to leave or to resign from her position.

■ Nichols's argument that her working conditions were intolerable is also without merit. "Whether a plaintiff's working conditions were intolerable is assessed by the objective standard of whether a reasonable person in the plaintiff's position would have felt compelled to re-

sign." *Taylor v. Virginia Union University,* 193 F.3d 219, 237 (4th Cir.1999), *cert. denied,* 528 U.S. 1189, 120 S.Ct. 1243, 146 L.Ed.2d 101 (2000). The Fourth Circuit has held that "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* (internal quotation marks omitted) (quoting *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994)).

Applying the reasonable person standard, it is clear that the working conditions here were not so intolerable as to support a constructive discharge claim. Moreover, by March 2000, defendant had taken any measure it could to see that Nichols's needs were met, culminating in a written Accommodation Plan that was revised several times to meet Nichols's continued requests for further accommodations. Therefore, when Nichols resigned in September 2000 at the beginning of the following school year, for at least several months, all of Nichols's concerns had been addressed and accommodations had been set in place to ensure a healthy working environment. This is not the type of working environment a reasonable person would consider intolerable. As the Fourth Circuit explained:

> Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance,

real or imagined, by the simple expedient of quitting.

*Bristow,* 770 F.2d at 1255. Thus, summary judgment shall be granted to defendant on the claim of constructive discharge.

### V.

An Order effectuating the determinations made herein follows.

### ORDER

In accordance with the foregoing Memorandum, it is this 18th day of March, 2002, by the United States District Court for the District of Maryland, ORDERED

(1) That the defendant's motion for summary judgment is GRANTED; and it is further ORDERED

(2) That JUDGMENT IS ENTERED IN FAVOR OF ALL DEFENDANTS AGAINST PLAINTIFF; and it is further ORDERED

(3) That the Clerk shall CLOSE THIS CASE and TRANSMIT copies of this Order and the foregoing Memorandum to the attorneys of record.